In the Matter of Mark
DALEN, Debtor.

No. 99–10424.

United States Bankruptcy Court,
W.D. Michigan.

March 12, 2001.

---

Alexander Jurczenko, Cleveland, Ohio, for Mark Dalen.

Marshall A. Yee, Lansing, Michigan, for Michelle Dalen.

John Potter, Grand Rapids, Michigan, for Dorothy L. Dalen.

H. Nathan Resnick, West Bloomfield, Michigan, for Metropolitan Plant & Flower, Inc.

Stephen B. Grow, Grand Rapids, Michigan, for Thomas Richardson, Chapter 7 Trustee.

## OPINION RE: METROPOLITAN PLANT & FLOWER, INC.'S MOTION TO ALTER OR AMEND ORDER GRANTING TRUSTEE'S MOTION FOR EXTENSION OF TIME AND DENYING MOTION FOR APPROVAL OF SETTLEMENT

JEFFREY R. HUGHES, Bankruptcy Judge.

On June 22, 2000, the court denied the motion of Thomas Richardson, the Chapter

7 trustee ("Trustee"), to approve a settlement he had reached with Metropolitan Plant & Flower, Inc. ("Metropolitan"). The court did not deny the motion because it believed that Trustee had exercised poor judgment in negotiating the settlement. Rather, the court withheld approval because the court exercised its own judgment and concluded that the estate's interests would be better served by Trustee continuing to pursue the issue which was in dispute with Metropolitan.

Metropolitan filed a motion pursuant to Fed.R.Bankr.P. 9023 to reconsider the court's decision to deny approval of the settlement. For the reasons stated in this opinion, the court concludes that it did not properly evaluate Trustee's motion to approve the proposed settlement. The court should have limited its review of the settlement to simply whether Trustee had complied with his fiduciary obligations to the estate in reaching the settlement that he did. Therefore, Metropolitan's motion is granted.

### PROCEDURAL BACKGROUND

Metropolitan holds a judgment against Mark Dalen ("Dalen") in the approximate amount of $1.9 million dollars. In November 1999, Metropolitan and Dalen reached a settlement (the "November 1999 Dalen/Metropolitan Judgment Settlement") which provided that the judgment would be reduced to zero if Dalen made an initial payment of $150,000 and a second payment of $240,200 by December 31, 1999. Dalen made the first payment. However, he did not have the financial resources to make the second.

On December 30, 1999, the day before the second payment to Metropolitan was due, Dalen filed for relief under Chapter 13 of the Bankruptcy Code.[1] By filing, Dalen hoped to get an extension of time within which to pay Metropolitan the settlement amount. In addition, he intended to enlist the bankruptcy court's assistance in funding the remaining installment due Metropolitan.

On February 9, 2000, Dalen filed an adversary proceeding on behalf of the estate against his estranged spouse, Michelle Dalen. Dalen alleged that various transfers of property which he had previously made to Michelle Dalen were avoidable as fraudulent conveyances. On February 14, 2000, Dalen filed a motion in that adversary proceeding for temporary injunctive relief whereby Dalen sought to compel Michelle Dalen to immediately turn over at least $240,200.00 to the estate so that the remaining settlement payment to Metropolitan could be made. Dalen asserted in his motion that such injunctive relief was necessary because Section 108(b) permitted the estate only until February 27, 2000 (i.e., 60 days from the date of the bankruptcy petition) to perform its remaining obligations under the settlement agreement with Metropolitan.

On February 17, 2000, Dalen's case was converted from a Chapter 13 to a Chapter 7 proceeding and Trustee assumed responsibility for the adversary proceeding against Michelle Dalen. The court scheduled a status conference for February 25, 2000. The court required Metropolitan to attend this status conference in addition to the named parties because it was the terms of Dalen's pre-petition settlement with Metropolitan which was at the root of the injunctive relief requested in conjunction with that adversary proceeding.

The parties agreed at the status conference that the estate's rights under Section 108(b) would be extended to March 24, 2000, at which time the court would hold a hearing to determine whether the estate would be granted a further extension of these rights. The parties also agreed that the court would decide at that time whether the estate's performance under the November 1999 Dalen/Metropolitan Judgment Settlement could be extended under

---

1. The Bankruptcy Code is set forth in 11 U.S.C. §§ 101, et seq. Unless otherwise noted, all further statutory references are to the Bankruptcy Code.

Trustee's alternative theory that the settlement agreement was an executory contract which Trustee could assume at a later date if an extension were granted pursuant to Section 365(d)(1). The court directed Trustee to file a motion formally requesting an extension of time under these two theories by no later than March 2, 2000, and the court required both parties to file briefs by no later than March 17, 2000.

Trustee filed the requisite motion on February 28, 2000 (the "Section 108(b)/Section 365(d)(1) motion")[2] and both Metropolitan and Trustee filed their briefs on March 17, 2000. The court reviewed these briefs and conducted its own research in preparation for the March 24, 2000 hearing. Unless Metropolitan could persuade it otherwise during oral argument, the court was prepared to rule at the March 24, 2000 hearing that the November 1999 Dalen/Metropolitan Judgment Settlement was an executory contract and that Trustee could have additional time to assume or reject that contract. However, shortly before the March 24, 2000 hearing, Trustee and Metropolitan requested that the hearing be adjourned. The court granted the request and rescheduled the hearing for April 14, 2000.

The parties did appear at the April 14, 2000 hearing. The court was again prepared to rule in favor of Trustee unless some compelling argument to the contrary was made during oral argument. However, the parties this time advised the court that they had reached a settlement which needed only to be noticed to creditors and approved by the court. The parties placed the settlement on the record and indicated that the settlement would be noticed to parties in interest with an opportunity to object. The court tentatively set May 15, 2000 as the date when the court would consider the settlement which Trustee and Metropolitan had reached. The court also adjourned Trustee's Section 108(b)/Section 365(d)(1) motion to this date to cover the contingency that the settlement might not be approved.

The settlement agreement was not noticed to parties in interest as planned because Trustee did not file his motion to approve the settlement until May 8, 2000. Therefore, the court rescheduled the hearing date concerning the settlement for June 22, 2000. The court also rescheduled Trustee's Section 108(b)/Section 365(d)(1) motion for that date.

Metropolitan and Trustee appeared at the June 22, 2000 hearing. Mark Dalen and Michelle Dalen also appeared. Dorothy Dalen, Debtor's first wife, completed all of the appearances.

The Court first heard arguments concerning Trustee's motion to approve the settlement with Metropolitan. The settlement provided that Metropolitan would have an allowed claim in the amount of $1,913,497.24, together with post-judgment interest through the bankruptcy petition date, and that $375,000.00 of the claim would be treated as secured.[3] The settlement further provided that the balance of Metropolitan's allowed claim, that being approximately $1,525,000.00, would be subordinated to all other creditors' claims against the estate. However, Metropolitan's remaining claim would still be superior to any residual interest which Dalen himself might have in the estate.

The clear benefit of this settlement to the estate was that it eliminated the risk that the court would deny Trustee's Section 108(b)/Section 365(d)(1) motion, thereby resurrecting Metropolitan's $1.9 million

---

**2.** Trustee withdrew at about the same time the motion for preliminary injunctive relief which Dalen had previously filed in his adversary proceeding against Michelle Dalen.

**3.** The settlement did provide that the estate could "redeem" Metropolitan's $375,000.00 secured claim for $350,000.00 if it paid the $350,000.00 by no later than June 13, 2000. That date apparently passed without Trustee's taking advantage of this right.

dollar judgment against Debtor with the attendant argument that it was fully secured.[4] The cost to the estate was that it required Trustee to disburse $375,000 to Metropolitan before any distribution could be made to other creditors whereas only $240,200 would have to be paid to Metropolitan if Metropolitan could eventually be compelled to accept the terms of the November 1999 Dalen/Metropolitan Judgment Settlement.

Dorothy Dalen and Mark Dalen were the only persons who objected to the settlement Trustee had reached with Metropolitan. Trustee was able to resolve Dorothy Dalen's objection prior to the hearing. Metropolitan challenged Mark Dalen's objection because it was not timely (Mark Dalen's objection was made orally at the June 22, 2000 hearing) and because he lacked standing. The court allowed Mark Dalen to proceed notwithstanding Metropolitan's challenges but ultimately overruled his objections to the proposed settlement.[5]

The court nonetheless denied Trustee's motion to approve his settlement with Metropolitan because the court had independently concluded that the settlement was not in the best interests of Dalen's creditors. The court also granted Trustee's Section 108(b)/365(d)(1) motion and gave the Trustee additional time to assume or reject the November 1999 Dalen/Metropolitan Judgment Settlement pursuant to Section 365.

The court supplemented its June 22, 2000 oral decision with a written opinion on August 25, 2000. The court also issued on that day its written order denying approval of the Trustee's proposed settlement with Metropolitan and granting Trustee's Section 108(b)/Section 365(d)(1) motion. It is the court's August 25, 2000 order denying approval of the proposed settlement which Metropolitan has asked the court to reconsider.[6]

## OPINION

Metropolitan has offered its own reasons as to why the court erred in denying approval of its settlement with Trustee. However, the court has not found any of these reasons particularly persuasive. The gist of Metropolitan's argument is that the court did not follow the checklists which other courts have adopted to analyze whether a settlement should be approved over a creditor's objection. *See, e.g., In re Dow Corning Corporation,* 192 B.R. 415, 421–22 (Bankr.E.D.Mich.1996); *In re Drexel Burnham Lambert Group,* 134 B.R. 493, 497 (Bankr.S.D.N.Y.1991).

The court was satisfied at the conclusion of the June 22, 2000 hearing that the tentative settlement which Trustee and Metropolitan had reached passed muster with respect to most of the factors enumerated in *Dow Corning* and that the remainder of the factors were either immaterial or irrelevant.[7] However, these factors do not

---

4. Metropolitan asserted not only that it had a judgment against Dalen in excess of $1.8 million but also that that judgment was secured by a judgment lien against all of Dalen's assets.

5. The court concluded that Dalen did have standing to object to the proposed settlement because the estate was potentially solvent. The court based this conclusion upon the possibility that the estate's assets (which Dalen valued at approximately $1.2 million dollars) would be sufficient to pay Dalen's other creditors in full and leave a balance for him if Metropolitan could be compelled to honor the pre-petition settlement which it had reached with Dalen concerning its judgment against him.

6. For reasons known only to Metropolitan, it did not file a motion to reconsider the court's order granting Trustee's Section 108(b)/Section 365(d)(1) motion. Rather, Metropolitan filed a notice of appeal with respect to that order. That appeal is currently pending before Judge Hillman of the United States District Court for the Western District of Michigan as Case No. 1:00CV726.

7. For example, there is no question that both parties to the settlement were represented by extremely capable counsel and that there was sufficient risk concerning the outcome of the Section 108(b)/Section 365(d)(1) motion from both parties' viewpoints to warrant reaching the settlement that they did.

stand alone. Rather, they represent a methodology which has developed over time as courts have attempted to give meaning to prior, more generic directives that settlements are to be "in the best interests of the estate" and "fair and equitable." What confounded the process in the instant case was the fact that the court was being asked to approve a settlement concerning a dispute which, for all practical purposes, the court was ready to rule on. The problem which confronted the court was similar to that which would confront a criminal court if it were asked to accept a plea bargain in a bench trial just as it began reading its decision.

This unique situation placed the court in the position where it had more information than either of the parties. The court knew that Trustee would prevail in his argument that the settlement was an executory agreement if he were to abandon his settlement with Metropolitan and proceed with the motion scheduled for that time.[8] Therefore, it became irrelevant whether any of the enumerated factors had been met. If the standards for evaluating a proposed settlement are in fact that which most courts routinely recite, that being what is in "the best interests of the estate" and what is "fair and equitable," then it was clear to this court that Trustee's continued pursuit of his Section 108(b)/365(d)(1) motion offered more to the estate than the settlement which Trustee had reached and therefore the settlement should not be approved.

The court remains satisfied that its conclusion was correct if what the court is to do when asked to approve a settlement is

to literally decide whether the settlement is "fair and equitable" and in the "best interests" of the bankruptcy estate's creditors. However, Metropolitan's post-hearing motion prompted the court to consider further what exactly is meant by these oft repeated phrases. The court's curiosity caused it to wander about the case law much as Odysseus and Aeneas wandered about the Mediterranean after the Trojan war. It is the lessons learned from this excursion which has led the court to conclude that it should have approved the settlement reached between Trustee and Metropolitan.

As already noted, most Code-era courts, when asked to approve a bankruptcy-related settlement, cite two standards against which a settlement is to be assessed: (1) whether the settlement is "in the best interests of the estate" and (2) whether the settlement is "fair and equitable." However, neither of these tests is incorporated into any provision of the Bankruptcy Code. In fact, there is no section in the Bankruptcy Code which even requires that a trustee seek court approval of a settlement. The absence of such a provision is noteworthy given that the Bankruptcy Code requires court approval for other actions taken by a trustee in the administration of the bankruptcy estate. For example, a trustee may not sell or lease property of the estate outside the ordinary course or assume or reject an executory contract without court approval. 11 U.S.C. § 363(b)(1) and 365(a).

Several provisions in the Federal Rules of Bankruptcy Procedure[9] do refer to court approval of settlements.[10] Rule

---

**8.** To ensure itself that no issues would be raised at the June 22, 2000 hearing which might require further consideration before rendering a decision, the court gave both parties the opportunity to present whatever additional arguments they might have had concerning the Section 108(b)/Section 365(d)(1) motion. Neither side offered anything new for the court to consider.

**9.** The Federal Rules of Bankruptcy Procedure are set forth as Fed.R.Bankr.P. 1001, *et seq.*

Unless otherwise noted, all further references to rules are to the Federal Rules of Bankruptcy Procedure.

**10.** The Federal Rules of Bankruptcy Procedure have the force of law except to the extent the rules conflict with substantive law. *In re Fuller*, 255 B.R. 300, 305 (Bankr.W.D.Mich. 2000).

9019(a) states when the court may approve a settlement or compromise by the trustee.

(a) **COMPROMISE.** On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

\* \* \*

Fed.R.Bankr.P. 9019(a).

Rule 2002(a)(3) dictates who must be given notice of the proposed settlement and the length of time which must pass between giving that notice and the hearing concerning the settlement's approval.

[T]he clerk ... shall give the debtor, the trustee, all creditors and indenture trustees at least 20 days' notice by mail of:

(3) the hearing on approval of a compromise or settlement of a controversy other than approval of an agreement pursuant to Rule 4001(d), unless the court for cause shown directs that notice not be sent;

\* \* \*

Fed.R.Bankr.P.2002(a)(3).

Rule 4001(d) addresses to whom notice must be given with respect to settlements relating to the automatic stay, the use of estate assets, and obtaining credit.

(d) **AGREEMENT RELATING TO RELIEF FROM THE AUTOMATIC STAY, PROHIBITING OR CONDITIONING THE USE, SALE, OR LEASE OF PROPERTY, PROVIDING ADEQUATE PROTECTION, USE OF CASH COLLATERAL, AND OBTAINING CREDIT.**

(1) Motion; Service. A motion for approval of an agreement (A) to provide adequate protection, (B) to prohibit or condition the use, sale, or lease of property, (C) to modify or terminate the stay provided for in § 362, (D) to use cash collateral, or (E) between the debtor and an entity that has a lien or interest in property of the estate pursuant to which the entity consents to the creation of a lien senior or equal to the entity's lien or interest in such property shall be served on any committee elected pursuant to § 705 or appointed pursuant to § 1102 of the Code or its authorized agent, or, if the case is a chapter 9 municipality case or a chapter 11 reorganization case and no committee of unsecured creditors has been appointed pursuant to § 1102, on the creditors included on the list filed pursuant to Rule 1007(d), and on such other entities as the court may direct. The motion shall be accompanied by a copy of the agreement.

Fed.R.Bankr.P. 4001(d)(1).

However, these rules make no reference whatsoever to "best interests" or "fair and equitable." Indeed, these rules do not suggest any standard for the court to apply when such approval is sought.

Moreover, Rule 9019(a) is at best ambiguous as to whether court approval of a settlement is even required. It certainly is possible to educe from Rule 9019(a) the requirement that all settlements involving the bankruptcy estate be court approved. However, Rule 9019(a) itself contains no such mandate. Rule 9019(a) states simply that the court **"may"** approve a compromise or settlement **"if"** a motion is filed by the trustee. Nothing within Rule 9019(a) actually prohibits a trustee from settling a claim for or against the estate outside the purview of the bankruptcy court.

The absence of any Bankruptcy Code provision requiring court approval of a settlement and the ambiguity of Rule 9019(a) contrast sharply with the former Bankruptcy Act's clear mandate that all settlements reached by the trustee be approved by the bankruptcy court.

§ 27. Compromises. The receiver or trustee may, **with the approval of the court,** compromise any controversy arising in the administration of the estate

upon such terms as he may deem for the best interest of the estate.

11 U.S.C. 50 (repealed) (emphasis added).[11]

In other words, a trustee under the former Bankruptcy Act was authorized to settle controversies arising during her administration of the estate, but only if the bankruptcy court first approved.

■ The court does not believe that the absence of a Bankruptcy Code section or Bankruptcy Rule similar to Section 27 of the former Bankruptcy Act is the result of Congressional oversight. Rather, the omission evidences a key component of Congress' overhaul of the bankruptcy laws in 1978. Under the former Bankruptcy Act, it was customary for the bankruptcy judge to work closely with the bankruptcy trustee as the trustee administered the estate. Congress determined that this relationship was inappropriate. It concluded that the bankruptcy judge could not be an impartial arbiter of disputes which arose during the administration of that estate if the bankruptcy judge was also overseeing the trustee's day-to-day administration of that estate.

Bankruptcy judges administer the present bankruptcy system (under the Bankruptcy Act), and are responsible for the administration of individual bankruptcy cases. Their administrative, supervisory, and clerical functions in these matters are in addition to their judicial duties in bankruptcy cases. The situation is in marked contrast to most litigation, in which the parties themselves manage the progress of the case. The judge does not become involved in the case, and if a party fails to take action, the judge does not intercede on his behalf. Instead, the party is foreclosed.

\* \* \*

The bankruptcy judges have stepped in to perform the supervisory role because of the dearth of creditor participation.

\* \* \*

The Bankruptcy Act provides for the default of creditor control by vesting the creditors' normal functions in the bankruptcy judge when the creditors do not exercise them. The bankruptcy judge is required to appoint a trustee in liquidation cases when creditors do not elect one. **The bankruptcy judge supervises the trustee in the performance of his duties, often suggesting causes of action that the trustee might pursue to recover assets for the estate. The bankruptcy judge reviews nearly all transactions that trustees enter into, and rules, usually ex parte, on their propriety. The bankruptcy judge frequently entertains requests for instructions from trustees for even the most routine matters.** In addition to his supervisory role with respect to the trustee, the bankruptcy judge must preside at first meetings of creditors, and

11. The Bankruptcy Act was enacted in 1898. Section 27 itself was derived from two general orders previously issued by the Supreme Court to regulate the administration of bankruptcy cases. General Order No. 28 stated in part:

**Redemption of Property and Compounding of Claims.**

Whenever it may be deemed for the benefit of an estate ... to compound and settle any debts or other claims due or belonging to the estate, the receiver or trustee ... may file his petition therefor; and thereupon the court shall appoint a suitable time and place for the hearing thereof, notice of which shall be given as the court shall direct, so that all creditors and other persons interested may appear and show cause, if any they have, why an order should not be passed by the court upon the petition authorizing or directing such an act on the part of the receiver or trustee ... General Order No. 33 reads:

**Arbitration and Compromise.**

Whenever a receiver, trustee or debtor in possession shall make application to the court ... for authority to compromise any such controversy, the application shall clearly and distinctly set forth the subject matter of the controversy, and the reasons why it is proper and for the best interest of the estate that the controversy should be settled by ... compromise.

must supervise examinations of the debtor, which are little more than depositions taken by the trustee or creditors to obtain information with which to begin an investigation.

It is enough of a reason for change that these functions and duties of the bankruptcy judge constitute no part of his judicial responsibilities, and divert him from the important judicial and legal work that must be done in bankruptcy cases. However, if that were the system's only vice, adjustments less than those proposed in the bill might suffice. Deeper problems arise because of the inconsistency between the judicial and administrative roles of the bankruptcy judges. The inconsistency places him in an untenable position of conflict, and seriously compromises his impartiality as an arbiter of bankruptcy disputes. The bankruptcy judge is often called upon to resolve disputes between the estate and adverse third parties. The estate is represented by the trustee, usually an appointee of the bankruptcy judge, serving in many cases that are before that judge, and continually being reappointed to new cases as they come in. There usually develops a close working relationship between the judge and "his" trustee, due to the necessity for frequent ex parte contacts between the judge and the trustee in the administration of the case. It is not uncommon to see a trustee enter a courtroom, for a hearing on a matter, from the judge's chambers, followed closely by the judge himself. As often as not, the trustee was working with the judge on a different matter than the one up for hearing. Nevertheless, the combined force of all of these factors seriously compromises the appearance of the bankruptcy judge as an impartial arbiter. They have worked to generate deep suspicion on the part of attorneys who practice in the bankruptcy court as to the fairness of the decisions of the bankruptcy court.

\* \* \*

None of these problems are the creation of the bankruptcy judges themselves. As a whole, they are fair-minded individuals who do the best they can to avoid the conflicts and institutional bias that exists in the bankruptcy system. Nevertheless, the structure of the system, written into the present Bankruptcy Act as law, necessitates the awkward position in which the bankruptcy judges find themselves, and brings disrepute on the whole system. The law must be changed to afford bankruptcy litigants the fair and impartial justice to which all other litigants in the federal courts are entitled.

H.R.Rep. No. 95–595, pp. 88–91, 95th Cong. 1st Sess. (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6049–53 (emphasis added). What Congress envisioned was a system in which the bankruptcy court was not to play a significant role in the actual administration of the estate. Intervention by the court was to be the exception, not the rule.[12]

The removal of the bankruptcy judge from the administration of the bankruptcy estate resulted in a greater amount of discretionary authority being given to the trustee. Section 704 outlines in broad, general terms what are to be the trustee's duties in administering a Chapter 7 bankruptcy case.[13] Specifically, Section 704(1) states that the Chapter 7 trustee shall:

**12.** Congress' objective of having the trustee administer a bankruptcy estate free from systematic oversight by the bankruptcy court is also reflected in the Bankruptcy Rules. For example, Rule 3009 sets forth the process by which a Chapter 7 trustee is to disburse dividends to creditors. Nowhere within this rule is there any requirement that the bankruptcy court approve the trustee's decisions concerning which creditors are to receive dividends or the amount or timing of those dividends.

**13.** The duties of a Chapter 11 trustee (or a debtor-in-possession), a Chapter 12 trustee and a Chapter 13 trustee derive from the same section, although some of the duties are omitted and others are added. *See* 11 U.S.C. §§ 1106–1107, 1202, and 1302.

(1) collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest.

11 U.S.C. § 704(1).[14]

Similarly, Section 721 gives the trustee broad authority to operate a Chapter 7 debtor's business once the court has determined that it is in the interests of the estate to operate that business.[15]

However, within this broad grant of unfettered authority to administer the estate lie discrete activities which Congress has prohibited the trustee from pursuing without bankruptcy court approval. For example, a trustee may not sell, use or lease property of the estate outside the ordinary course of business without prior notice and a hearing. 11 U.S.C. § 363(b)(1). Nor may a trustee obtain credit without prior notice and a hearing unless it is unsecured and incurred in the ordinary course of business. 11 U.S.C. § 364. A trustee may also not assume or reject an executory contract or unexpired lease without prior court approval. 11 U.S.C. § 365(a).[16]

 The absence of a similar Bankruptcy Code section requiring court inter-

---

**14.** The comparable section in the former Bankruptcy Act reads that trustees shall:

> (1) collect and reduce to money the property of the estates for which they are trustees, **under the direction of the court,** and close up the estates as expeditiously as is compatible with the best interests of the parties in interest.

11 U.S.C. § 75(1) (repealed) (emphasis added).

**15.** A Chapter 11 trustee (or debtor-in-possession), a Chapter 12 debtor-in-possession and a Chapter 13 debtor all have the broad authority to operate a debtor's business even without prior direction from the bankruptcy court. 11 U.S.C. §§ 1108, 1203, and 1304.

**16.** That a trustee is to administer a bankruptcy estate for the most part independent of any supervision of the bankruptcy court does not mean that the trustee is entirely without oversight. The United States trustees are charged with supervising all of the bankruptcy trustees (and debtors-in-possession) within their respective regions. 28 U.S.C. 586(a)(1) and (3). Indeed, the purpose of the United States trustee program is to fill the gap left by Congress' decision to remove the bankruptcy judges from the supervisory role which they had come to perform under the former Bankruptcy Act.

> The second major change proposed by the bill is the creation of a Government officer to supervise the conduct of bankruptcy cases, and to serve as trustee in bankruptcy cases when private trustees are unwilling to serve. Many of the functions assigned to the new official, called the United States trustee, are currently performed by bankruptcy judges. Under the proposed system, the bankruptcy judges will be handling only judicial matters in bankruptcy cases. The proposed United States trustees will be the repository of many of the administrative functions now performed by bankruptcy judges, and will serve as bankruptcy watchdogs to prevent fraud, dishonesty, and overreaching in the bankruptcy arena.

H.R.Rep. No. 95–595, p. 88, 95th Cong.1st Sess. (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6049.

A trustee is also accountable to creditors and other parties in interest concerning her administration of the bankruptcy estate. A challenge to the trustee's activities may arise as an objection to the fees requested by the trustee or as an action against the trustee or her bonding company. Inappropriate conduct might also prompt a motion to remove the trustee.

The Sixth Circuit, in *Ford Motor Credit Company v. Weaver,* 680 F.2d 451 (6th Cir. 1982), set forth the circumstances under which a trustee may be held accountable:

> A trustee in bankruptcy may be liable for violations of his fiduciary duties. A trustee in bankruptcy can be liable in his official capacity or individually. A bankruptcy trustee is liable in his official capacity for acts of negligence. The applicable standard is the exercise of due care, diligence and skill both as to affirmative and negative duties. The measure of care, diligence and skill required of a trustee is that of an ordinarily prudent man in the conduct of his private affairs under similar circumstances and with a similar object and view. Mistakes in judgment cannot be the basis of a trustee's liability in his official capacity. The failure to meet the standard of care, however, subjects the trustee to liability in his official capacity.

*Id.* at 461–62 (citations omitted). *Cf. In re Cochise College Park, Inc.,* 703 F.2d 1339 (9th Cir.1983) (holding that a trustee is also personally liable for negligent conduct).

vention in instances where the trustee desires to settle a matter involving the estate, coupled with the permissive language of Rule 9019(a), leads the court to conclude that Congress[17] intended the settlement approval process referenced in the Bankruptcy Rules to be discretionary, not mandatory. In other words, Rule 9019(a) is intended to be nothing more than a safe harbor for trustees who wish to avail themselves of the bankruptcy court's protection prior to entering into settlement agreements which may have substantial consequences to the estate. Whether the trustee seeks such approval is left entirely to her discretion. She may pursue and consummate a settlement without bankruptcy court intervention if she so chooses.[18]

It would appear at first blush that the Supreme Court's decision in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968), requires bankruptcy courts to approve all settlements notwithstanding the absence of any such mandate in either the Bankruptcy Code or the Bankruptcy Rules. Courts frequently cite *Anderson* for the proposition that settlements reached as part of the bankruptcy process must be "fair and equitable" and in the "best interests" of creditors. *See, e.g., In re Drexel Burnham Lambert Group, Inc.,* 134 B.R. at 496. However, as is often the

case with frequently cited opinions, the purported holding in *Anderson* has expanded over time.

*Anderson* involved a Chapter X reorganization under the former Bankruptcy Act. The debtor operated a shipping business which transported truck trailers between Florida and Puerto Rico. A group of creditors (the "Caplan Group") and another creditor, Merrill–Stevens Dry Dock & Repair Co. ("M–S"), held substantial secured claims against the estate.

The Chapter X trustee, after an extensive investigation, reported that the estate had substantial causes of action against both the Caplan Group and M–S which, if successfully prosecuted, would eliminate their claims. The lower court had relied upon this report to revoke a plan which had previously been confirmed.

Thereafter, two new plans of reorganization were submitted for approval. Both plans provided that the Caplan Group and M–S would receive approximately 40% of the equity in the reorganized debtor. The plans also extinguished the equity interests of all former shareholders. The committee which represented the former shareholders objected to the plans. After a hearing, the lower court approved both plans.

The Court concluded that the record was insufficient to support the lower court's decision and therefore remanded

---

**17.** Congress, not the Supreme Court, ultimately controls the content of the Federal Rules of Bankruptcy Procedure. Although the Supreme Court is responsible for drafting the bankruptcy rules, the Supreme Court must transmit its draft rules to Congress for its consideration. The draft rules become effective only if Congress does not act within a specified period of time. 28 U.S.C. § 2075.

**18.** Interpreting Rule 9019(a) as requiring the trustee to seek court approval of settlements would also create a problem when the settlement reached by the trustee is of little consequence to the estate. Although the Bankruptcy Code requires the court to intervene in connection with the sale of estate property, there is an exception for sales made in the ordinary course. 11 U.S.C. § 363(c). Rule

9019(a) contains no such exception. Therefore, if Rule 9019(a) were to be interpreted as mandatory, then all settlements, both inside and outside the ordinary course, would have to be approved. Such an interpretation could lead to the incongruous situation of a trustee's being able to sell an expensive inventory item (e.g., a $100,000 front end loader) in the ordinary course without court order yet not being able to resolve a subsequent dispute concerning that sale, no matter how inconsequential. It is unlikely that Congress intended the bankruptcy courts to micro-manage trustee settlements and the court is unwilling to read into Rule 9019(a) an ordinary course exception to trustee settlements without at least some positive suggestion from Congress.

the case for further consideration. In reaching this conclusion, the Court focused on the fact that the Caplan Group and M–S were to receive substantial equity interests under the plans. It determined that the favorable treatment of those creditors was tantamount to a settlement of the estate's objections to their claims. More importantly, the Court determined that the settlement of those claims required particular scrutiny because the plans further provided that the original shareholders of the debtor were to receive nothing.

It is in this context that the Court's oft quoted language about "fair and equitable" settlements and the judge's responsibility to exercise "informed and independent judgment" must be evaluated. In making these remarks, the Court was not referring to the process by which a bankruptcy judge was to generally assess a settlement proposed by a trustee. The Court made no reference to Section 27, the former Bankruptcy Act section which did address the circumstances under which a court could approve a settlement proposed by the trustee. Nor is there any reference in the Court's opinion to the "best interests" test contained in that former section although numerous courts have since cited *Anderson* for the proposition that proposed settlements must meet this standard.

Rather, the Court was referring to an entirely different section of the former Bankruptcy Act, that being Section 174. This section related to the standards required for confirmation of a Chapter X plan of reorganization.

> After a hearing ... the judge shall enter an order approving the plan or plans which **in his opinion** comply with the provisions of Section 216 of his Act, and

which are **fair and equitable,** and feasible.

11 U.S.C. § 574 (repealed) (emphasis added).[19]

What the Court recognized when it made its observation about the settlements which had been incorporated into the *Anderson* debtor's proposed Chapter X plans was that settlements and compromises which substantially affect a debtor's reorganization, whether incorporated into the plan itself or reached prior to plan confirmation, must meet the same standards for plan confirmation as any other plan term, including the requirement that each term be "fair and equitable." Moreover, the Court observed that it was the bankruptcy court's responsibility under former Section 174 to exercise its own judgment in making this determination.

> Compromises are 'a normal part of the process of reorganization.' In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts. **At the same time, however, it is essential that every important determination in reorganization proceedings receive the 'informed, independent judgment' of the bankruptcy court.** The requirements of §§ 174 and 221(2) of Chapter X, 52 Stat. 891, 897, 11 U.S.C. §§ 574, 621(2), that plans of reorganization be both 'fair and equitable,' apply to compromises just as to other aspects of reorganizations. **The fact that courts do not ordinarily scrutinize the merits of compromises involved in suits between individual litigants cannot affect the duty of bankruptcy court to**

---

19. Section 221 of the former Bankruptcy Act also included a "fair and equitable" requirement for Chapter XI plans:

> The judge shall confirm a plan if satisfied that—
>
> * * *
>
> (2) the plan is fair and equitable, and feasible;

11 U.S.C. § 621(2) (Repealed).

Although *Anderson* involved a Chapter X reorganization, the Court cited the "fair and equitable" standard required for the confirmation of a Chapter XI plan as well.

determine that a proposed compromise forming part of a reorganization plan is fair and equitable. There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation. It is here that we must start in the present case.

*Anderson,* 390 U.S. at 424, 88 S.Ct. 1157 (citations omitted) (emphasis added).

The Bankruptcy Code also requires that plans of reorganization be "fair and equitable." 11 U.S.C. § 1129(b)(1).[20] Therefore, the reasoning in *Anderson* is equally applicable to settlements reached as part of a Chapter 11 reorganization. *U.S. v. AWECO (In re AWECO),* 725 F.2d 293, 298 (5th Cir.1984). If anything, the test for determining whether a settlement proposed as part of a reorganization proceeding is "fair and equitable" is clearer under the Bankruptcy Code than under the former Bankruptcy Act since the Bankruptcy Code sets forth, at least in part, what that phrase is to mean. 11 U.S.C. § 1129(b)(2).

■ To summarize, *Anderson* does not support either the proposition that the bankruptcy court must approve every settlement involving the estate or the proposition that the bankruptcy court is to exercise its independent judgment as to what may be in the best interests of the estate when the trustee does ask it to approve a settlement.[21] What *Anderson* does recognize is that there are other provisions of the Bankruptcy Code which may mandate court approval of a settlement even if Rule 9019(a) does not. A trustee may, in her discretion, elect not to seek court approval of a proposed settlement provided that the Bankruptcy Code does not otherwise require the court to intervene. For example, *Anderson* itself instructs that a trustee's discretion to settle a claim without court approval in a Chapter 11 proceeding will be constrained by the absolute priority rule of Section 1129(b) if that settlement would have a significant impact upon the debtor's reorganization. There might also be instances where court approval would be required because the settlement contemplated a transfer of estate property within the meaning of Section 363(b).[22]

**20.** The holding in *Anderson* is not confined to pre-plan settlements. It is equally applicable to other pre-plan activities. For example, it is possible that a Chapter 11 debtor could satisfy all the elements required by *Stephens Industries, Inc. v. McClung,* 789 F.2d 386 (6th Cir. 1986), to permit a pre-confirmation sale of substantially all of its assets pursuant to Section 363(b)(1) yet still not be able to secure approval of that sale because of the objecting creditor's right to fair and equitable treatment under Section 1129(b).

**21.** The failure of the lower court's record to also provide any support for a finding that the settlement between the Chapter X trustee and the Caplan Group and M–S met the "best interests" test mandated by Section 27 of the former Bankruptcy Act could have formed a second basis for the Supreme Court in *Anderson* to have reversed the lower court's decision. However, it does not appear that the objecting parties ever raised this issue. In any event, even had the Court addressed this issue and concluded that the compromise also did not meet the standards of Section 27, I would still conclude that *Anderson* does not require that bankruptcy courts operating under the Bankruptcy Code approve all settlements which involve the estate. As already discussed, there is no counterpart to Section 27 of the former Bankruptcy Act in the Bankruptcy Code and the legislative history strongly suggests that Congress did not intend this mandate to carryover to the Bankruptcy Code by implication either.

**22.** One might argue that most, if not all settlements, have some impact upon the property of the estate and therefore Section 363(b)

If court approval of trustee settlements was mandatory, I would interpret that mandate as a direction from Congress that I interpose my own judgment as to whether the settlement proposed would serve the estate's interests or not. However, having concluded that bankruptcy court approval of a settlement is discretionary, I am compelled to further conclude that I should evaluate the settlement using only the facts as known to the trustee at the time the settlement was reached. I arrive at this conclusion because the primary, if not only, reason why a trustee would voluntarily seek court approval of a settlement would be to protect herself from a subsequent challenge by the United States trustee, a creditor or some other party in interest as to whether she acted properly in reaching her decision to settle.

Whether a trustee is ever challenged concerning the management of the estate is for the most part left to the United States trustee and the creditors. If the United States trustee or a creditor does not commence an action against the trustee within the applicable statute of limitations, then the trustee has nothing to worry about. Indeed, in a system where trustees are not permitted to seek bankruptcy court approval for each and every activity undertaken during their administration of the estate, the passage of time is often the only protection afforded to trustees (and debtors-in-possession) with respect to the myriad of decisions they must make every day.[23]

At the other end of the spectrum are those activities where preapproval by the court is mandatory. For example, the Bankruptcy Code requires that the sale of estate property outside the ordinary course of business, the incursion of nontrade debt, the assumption or rejection of an executory contract and the abandonment of estate property all be done only upon court order. 11 U.S.C. §§ 363(b), 363(b)–(d), 365(a) and 554(a).[24] Congress

approval is required in most instances even if Rule 9019(a) approval is not. However, in order to reach that conclusion, one must give a very expansive definition to the phrase "use, sell or lease" as used in Section 363(b). Nothing within Section 363 itself suggests that the words contained in this phrase are to be given anything other than their common, everyday meaning. Moreover, if "use, sell or lease" were to be broadly defined, then almost every conceivable action by the trustee would also fall within the purview of Section 363(b), thereby reinserting the bankruptcy court into the administrative role which Congress has expressly indicated that it is not to assume. While the ordinary course exception to Section 363(b) may mitigate the effect of this interpretation in instances where the trustee or the debtor-in-possession is operating a business, it would offer only marginal relief to the Chapter 7 trustee administering a typical estate.

23. In *Mosser v. Darrow*, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951), the Supreme Court concluded that a bankruptcy trustee may be held personally liable for acts undertaken during the administration of the bankruptcy estate but then attempted to soften the impact of its decision by noting that the trustee could always avoid such liability by "[seeking] instructions from the court ... as to matters which involve difficult questions of judgment." 341 U.S. at 274, 71 S.Ct. 680. However, *Mosser* was a Bankruptcy Act case, and it is questionable whether a trustee could seek similar relief under the Bankruptcy Code, at least under circumstances which would not warrant the commencement of an action for declaratory relief. Congress has made it clear that the bankruptcy courts are to maintain their independence by extracting themselves from the general administration of the bankruptcy estate. However, prohibiting the bankruptcy courts from intervening in the process would be meaningless if trustees were still able to draw the courts into the administrative milieu by incessant requests to approve proposed actions. The fact that Congress enacted a specific rule to grant trustees the authority to secure prior court approval of a settlement or compromise further reinforces the conclusion that courts are not to engage in issuing such comfort orders unless specifically authorized by the Bankruptcy Code or its attendant rules.

24. Section 365(a) is the only section of these four Bankruptcy Code sections which actually states that court approval is required. The other three sections require only "notice and a hearing." However, a hearing, as that term is defined in the Bankruptcy Code, requires judicial involvement, either as part of an actual hearing or as the recipient of a proposed

has directed the bankruptcy court to intervene in these instances and exercise its own judgment as to the appropriateness of the proposed judgment. The court, not the trustee, is to decide what is in the best interests of the estate under these circumstances.[25] The trustee is protected by court orders approving these activities not because the court has made an independent assessment as to whether the proposed action represents a prudent decision by the trustee but because the court's own decision as to what is in the best interests of the estate necessarily immunizes the trustee from any subsequent criticism concerning that decision.[26]

A trustee's decision to settle an estate claim is more akin to decisions for which court approval is not permitted than to

decisions for which court approval is mandatory. As already discussed, nothing obligates the trustee to seek court approval of a proposed settlement. It is discretionary. If the trustee were to forgo court approval and if a creditor were to challenge the trustee's decision to settle at some later date (*e.g.*, through an objection to fees), the court would evaluate that decision in the same manner as it would for any other trustee decision for which prior court approval was not permitted. That is, the court would determine whether the challenge has merit based upon the standard of what an ordinarily prudent person might do. *Ford Motor Credit Company v. Weaver*, 680 F.2d at 461–62.

■ In reality, Rule 9019(a) is nothing more than a free pass for the trustee to

---

order after notice and the expiration of the time to object or, in appropriate circumstances, without an opportunity to object. 11 U.S.C. § 102(1). It is, of course, black letter law that a court is only to act through its orders. *New Horizon of NY, LLC v. Jacobs*, 231 F.3d 143, 152–53 (4th Cir.2000). Therefore, it is fair to say that any activity covered by one or more of these sections requires an actual court order authorizing the activity before the trustee may proceed.

25. There is a temptation to apply the business judgment rule as a universal standard for all activities for which court approval is sought. This would be a mistake. Given Congress' decision to remove the bankruptcy court from the administration of bankruptcy estates, it is unlikely that Congress mandated court approval of sales, credit and other such transactions solely to test whether the trustee's decision would pass muster if she were later sued on account of that decision. Rather, Congress intended the bankruptcy court to impose its own judgment as to what is in the estate's best interests in these instances.

How the court evaluates what is in the best interest of creditors will vary depending upon the activity for which approval is sought. The approval of the sale of estate property outside the ordinary course would involve consideration of other offers and issues such as the timing or methodology of the proposed sale. Alternatively, if the trustee were requesting that an executory contract be assumed, the court would compare the prospective benefits against the potential risks of that assumption. However, the basic question for the court in

these situations should always be the same: is the activity proposed by the trustee, in the judgment of the court based upon all facts available to it at the time of its decision, in the best interest of the estate and its creditors?

While the trustee's rationale for proposing the action would be certainly relevant, it would be only one factor. Input from other parties in interest would be equally pertinent, as would the court's own evaluation of the facts and applicable law. It would remain within the court's prerogative to reject the trustee's proposal even if that proposal could be defended under the business judgment rule in an action against the trustee. That a trustee can rely upon such an order in a subsequent challenge to her administration of the bankruptcy estate is a byproduct of this process, not the purpose.

26. That the court is to interpose its own judgment concerning what is in the best interests of the estate in these situations does not mean that the trustee's recommendation is to be ignored. Indeed, in most instances one would expect that the court's judgment and the trustee's judgment would coincide. However, there will inevitably be instances where the court chooses to reject the trustee's recommendation because new information is brought to the court's attention or a creditor's argument in opposition is particularly persuasive Rejection of the trustee's recommendation in situations such as these does not mean that the trustee has exercised poor business judgment. It simply means that the court's own judgment as to what is in the best interests of the estate has prevailed.

secure declaratory relief regarding her personal exposure with respect to compromises and settlements made by her on behalf of the estate. The issue is the same whether she seeks validation of her decision prior to consummating the settlement through this declaratory process or waits until a creditor challenges her decision to secure vindication. In either case, the question which the court will be asked to decide is not whether the settlement is or was in the best interests of the creditors; rather, it is whether the trustee's decision to enter into the compromise or settlement is or was made with the same care, diligence and skill expected of "an ordinarily prudent man in the conduct of his private affairs under similar circumstances and a similar object and view." *Id.*

I have found nothing in either the Supreme Court or Sixth Circuit case law which would compel me to reach a different conclusion. Indeed, there is not much case law which actually analyzes the process for approving bankruptcy settlements. The Supreme Court case most frequently cited, *Anderson*, is actually a case involving the absolute priority rule. As for Sixth Circuit law, the most extensive discussion is in *Fishell v. Soltow*, 1995 WL 66622 at *2 – *5. (6th Cir.1995). However, *Fishell* is an unpublished opinion.[27]

Two other Sixth Circuit opinions which are published do cite *Anderson* as setting the standard for approving bankruptcy settlements. *Unsecured Creditors' Committee v. First National Bank & Trust Company of Escanaba (In re Ellingsen MacLean Oil Co., Inc.)*, 834 F.2d 599, 604 (6th Cir.1987); *Reynolds v. Commissioner of Internal Revenue*, 861 F.2d 469, 473 (6th Cir.1988). However, neither of these cases is on point. A third Sixth Circuit opinion, *Bauer v. Commerce Union Bank, Clarksville, Tennessee*, 859 F.2d 438 (6th

Cir.1988), also references bankruptcy settlements, but it too is not on point.

However, there is a well developed body of Sixth Circuit case law concerning the process by which a court is to approve consent decrees. *See, e.g., Williams v. Vukovich*, 720 F.2d 909 (6th Cir.1983); *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013 (6th Cir.1994); *Stotts v. Memphis Fire Department*, 679 F.2d 541 (6th Cir.1982), *rev'd on other grounds*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). These cases offer considerable assistance in determining how a bankruptcy court should evaluate a settlement agreement which has been presented to it by a trustee for approval.

■ Consent decrees are settlement agreements which are incorporated into a court order for purposes of enforcement. They often are the product of litigation brought to redress alleged employment discrimination. Parties are encouraged to enter into consent decrees as opposed to actually litigating employment discrimination actions because remediation is often more successful if it is the product of voluntary negotiation between the parties. *United States v. City of Miami*, 614 F.2d 1322, 1331–32 (5th Cir.1980).

■ "A consent decree is essentially a settlement agreement subject to continued judicial policing." *Vukovich*, 720 F.2d at 920. It incorporates a voluntary settlement agreement which is governed by the rules of contract. In one sense, it is nothing more than documentation of the bargained for positions of the parties. *Id.*

The contractual aspect of a consent decree has caused courts to approach the approval of such decrees with caution.

> In what can be termed "ordinary litigation," that is, lawsuits brought by one private party against another private

---

**27.** An "unpublished opinion" is a decision which the Sixth Circuit has determined should not be published in full text in the Federal Reporter. 6 Cir. IOP 206. An unpublished opinion is not binding on subsequent Sixth Circuit panels, 6 Cir.R. 206(c), and it may not be cited by non-parties except under exceptional circumstances. 6 Cir.R. 28(g).

party that will not affect the rights of any other persons, settlement of the dispute is solely in the hands of the parties. If the parties can agree to terms, they are free to settle the litigation at any time, and the court need not and should not get involved. As Judge Wyzanski has described this situation: "the traditional view is that the judge merely resolves issues submitted to him by the parties ... and stands indifferent when the parties, for whatever reason commends itself to them, choose to settle a litigation." *Heddendorf v. Goldfine,* 167 F.Supp. 915, 926 (D.Mass.1958).

\* \* \*

"[A]n active role for the trial court in approving the a settlement is the exceptional situation, not the general rule."
*City of Miami,* 614 F.2d at 1330–31.

In other words, a court, as a general rule, is to assume a laissez-faire attitude toward settlements reached between parties in a pending action. Taking such an approach promotes consistency since court intervention is seldom required if a dispute is settled by the parties prior to the commencement of a court proceeding. It makes little sense for a court to interpose its judgment concerning a settlement in an ordinary dispute after the commencement of an action if no such intervention is required by the court prior to the commencement of that action.

▮ However, a consent decree, by its nature, is not simply a settlement between two parties. Rather, it is an order which implicitly, if not explicitly, approves a settlement which is incorporated into its provisions. Judicial approval of the parties' settlement "places the power and prestige of the court behind the compromise struck by the parties." *Vukovich,* 720 F.2d at 920.

A consent decree, although founded on the agreement of the parties, is a judgment. It has the force of res judicata, protecting the parties from future litiga-

tion. It thus has greater finality than a compact. As a judgment, it may be enforced by judicial sanctions, including citation for contempt if it is violated.

\* \* \*

The court ... must not merely sign on the line provided by the parties. Even though the decree is predicated on consent of the parties, the judge must not give it perfunctory approval. As Professors Moore and Curier state:

[T]he judgment is not an inter partes contract; the court is not properly a recorder of contracts, but is an organ of government constituted to make judicial decisions and when it has rendered a consent judgment it has made an adjudication.

*United States v. City of Miami,* 664 F.2d 435, 439–41 (5th Cir.1981) (en banc concurring opinion) (footnotes and internal citations omitted).

▮ Therefore, before a court gives its imprimatur to a settlement through an order or consent judgment, the court should have before it sufficient information to, at a minimum, ascertain that the settlement reached is not illegal, unconstitutional, or against public policy. "Judicial approval, therefore, may not be obtained for an agreement which is illegal, a product of collusion, or contrary to the public interest." *Vukovich,* 720 F.2d at 920. Approving a settlement without making such an inquiry unnecessarily places the judicial system at risk of embarrassment or of unduly burdening itself with administrative tasks.

If a consent decree provided that a violator could be punished by having his ears cut off, the judge could not sign it; nor could he if the decree placed upon him duties either inappropriate to the judicial role or excessively time-consuming in relation to his other responsibilities.

*Donovan v. Robbins,* 752 F.2d 1170, 1176 (7th Cir.1985).

Another reason why consent decrees involving employment discrimination require independent evaluation by the judiciary before entry is that the provisions of the decree will inevitably affect persons other than those who were the immediate parties to the agreement. If these persons are to be bound by the terms of the consent decree, then it is appropriate for the court to give them an opportunity to offer why the settlement may be unfair to them before the court places its authority behind the terms of that decree. *Stotts*, 679 F.2d at 552–53; *Vukovich*, 720 F.2d at 921.

The Sixth Circuit has adopted a two-step process to ensure that consent decrees in employment discrimination cases do not compromise either the court's own integrity or the rights of third parties.

Initially, a proposed decree should be preliminarily approved. The court should determine whether the compromise embodied within the decree is illegal or tainted with collusion.

The court's [preliminary] determination should be based on its familiarity with the issues, the results of discovery, and the character of the negotiations prior to the entry of the decree. **Preliminary approval is critical for a decree which is the product of arms-length negotiations. With such approval a decree is presumptively reasonable. An individual who objects, consequently, has a heavy burden of demonstrating that the decree is unreasonable.**

Notice should be given to all individuals who may be affected by the decree. Notice can best be given by posting the decree and the procedure for filing a comment in conspicuous locations at the place of employment. Additionally, notice could be given by placing an advertisement in the local newspaper. Members of plaintiff class, however, must receive the "best notice practical under the circumstances, including individual notice to all members who can be identified through reasonable effort." ... All parties should also be afforded a full and fair opportunity to consider the proposed decree and develop a response.

* * *

The reasonableness hearing is a forum for all interested parties to comment on the proposed decree. The ultimate issue the court must decide at the conclusion of the hearing is whether the decree is fair, adequate and reasonable. The Court [sic] has no occasion to determine the merits of the controversy or the factual underpinning of the legal authorities advanced by the parties. If the court determines that the decree is problematic, it should inform the parties of its precise concerns and give them an opportunity to reach a reasonable accommodation. The court should articulate its "principled reasons" for rejecting a decree if the accommodation is not satisfactory. In making the reasonableness determination the court is under the mandatory duty to consider the fairness of the decree to those affected, the adequacy of the settlement to the class, and the public interest.

The decree must be fair and reasonable to those it affects.

* * *

*Vukovich*, 720 F.2d at 920–21 (citations omitted) (emphasis added).

The court does not believe that the process outlined in *Vukovich* concerning consent decrees should be followed to the letter in evaluating trustee settlements for which bankruptcy court approval is sought. Indeed, one court has observed that the process which a court will utilize in evaluating a particular consent decree will vary depending upon the remedy requested.

Although a judge thus must, before signing an equity decree that either affects third parties or imposes continuing duties on him, satisfy himself that the decree is reasonable ("fair, reasonable and adequate" in the usual formulation ... but we think "reasonable" sums it up fairly and adequately), how deeply

the judge must inquire, what factors he must take into account, and what weight he should give the settling parties' desires will vary with the circumstances. The flexible character of the decision makes generalization difficult; but it is safe to suggest that the limitations of judicial competence and the desirability of encouraging out-of-court settlements in order to lighten the judicial caseload create a presumption in favor of approving the settlement.

*Donovan,* 752 F.2d at 1176–77.

Moreover, consent decrees in employment discrimination actions typically have greater consequences upon parties and the public at large than a trustee's settlement of a claim for or against the estate.

 However, the issues identified in *Vukovich* and the other decisions involving employment discrimination consent decrees are remarkably similar to those encountered when a bankruptcy court is asked to approve a settlement. Approval of a trustee's settlement, like the entry of a consent decree, represents a federal court's endorsement of an arrangement which not only will reflect upon the court's own image but also may significantly affect the rights of numerous persons who did not participate in the negotiations (*i.e.,* creditors and other parties in interest). Accordingly, these decisions do offer guidance concerning the principles and processes which should be employed when such a request is made.

 One lesson learned is that a bankruptcy court should not consider for approval every agreement reached between two or more parties during the course of the administration of a bankruptcy estate. A bankruptcy court should be no more "a recorder of contracts" than any other court. *See, City of Miami,* 614 F.2d at 1330. This point is underscored by Congress' own directive that bankruptcy courts are not to participate in the regular administration of the bankruptcy estate under the Bankruptcy Code but instead are to serve as independent arbiters of disputes as they arise during the course of that administration.

 There are many instances where a proposed settlement is simply the acknowledgment by a party that the relief sought by the another party may be entered without further adjudication by the court. For example, a secured creditor and a debtor will often submit a settlement which provides nothing more than that the automatic stay be modified. Similarly, a creditor and a debtor may present a consent judgment for entry which acknowledges that the creditor's claim is non-dischargeable and which establishes the amount which the creditor may recover. It is clearly appropriate for the court consider entry of this type of settlement.[28]

However, many settlements which are submitted to the court contain numerous

28. Of course, there is nothing that compels these parties to seek such an order from the court. The parties could choose instead to rely upon the settlement itself. For example, it is not absolutely necessary for a secured creditor who has reached an agreement with a debtor to modify the automatic stay to have the court enter an order to effectuate that agreement. Instead, the secured creditor could elect to simply proceed with collection as permitted by the settlement. If, at some later date, the debtor were to claim that the secured creditor had violated the automatic stay, the secured creditor could at that time offer the settlement as an affirmative defense and argue that the debtor is contractually prohibited from seeking relief.

Relying only upon the settlement may not be as comforting as actually having the agreed to relief ordered by the court. However, if the creditor wishes to convert the stipulated relief into an immediate order, then it must also recognize that entry of that order is not automatic. At a minimum, the court must satisfy itself that the order is not illegal or against public policy. *See, infra.* For example, a court should not enter a stipulated order which declares a debt to be non-dischargeable if the court determines that the debt does not fall within any of the non-dischargeability categories set forth in Section 523. *See, e.g., Chevy Chase FSB v. DeGraves (In re DeGraves),* 1991 WL 303452 (W.D.Mich. 1991).

terms, conditions, and conditions which go well beyond a simple agreement concerning stipulated relief. Included is everything from admissions as to the amount of the debt and the value of collateral to provisions outlining conditions of default and remedies resulting therefrom. These settlements often are submitted as stipulations which conclude with a cursory "IT IS SO ORDERED" or are presented in the guise of a multi-page consent judgment. Indeed, there are many instances where the settlement does not even request the court to enter any immediate relief.

■ When this kind of order is submitted, the parties are in effect asking the bankruptcy court to place its own power and prestige behind the private agreement they have reached. Such orders transform what originally had been simply agreed upon terms between the parties into integral parts of an order which the court may later be called upon to enforce. However, *Vukovich* instructs that court endorsement of agreements between parties is to be the exception, not the rule, and that even when such an endorsement is appropriate, it should be granted only after the court has given due consideration to the impact that settlement may have both upon third parties and upon the court's own reputation.

■ Therefore, bankruptcy courts should generally not approve settlements which do not involve the bankruptcy trustee or the debtor-in-possession. Unlike trustees and debtors-in-possession, there is nothing within the Bankruptcy Rules which authorizes creditors, debtors, or other parties in interest to procure court approval of a settlement. The one exception to this rule appears to be settlements reached between a creditor and a debtor which would fall within the ambit of Rule 4001(d). However, even in those instances, the settlement should not be submitted as a consent judgment or stipulation to which the court is to affix "IT IS SO ORDERED" or a similar decree. Rather, the parties' request to the court should be simply to approve the settlement they have reached and the corresponding order should indicate nothing more than that the agreement has been approved or that it has not been approved.[29] If the proposed settlement between such parties requires that immediate relief be granted to one of the parties through entry of an order, then the parties should submit to the court an order which provides for the specific relief to which the parties have consented without also incorporating into that order the balance of the settlement.[30]

29. The question arises as to what the court is to consider in giving or withholding its approval to an adequate protection settlement or an agreement to lift stay when the party is, for example, a Chapter 13 debtor. As discussed later in this opinion, if the settlement involved a trustee and the trustee sought approval of the settlement, the issue would be whether the trustee had breached her duties as a fiduciary in arriving at the settlement. However, a debtor is not a fiduciary of the bankruptcy estate. Moreover, it would be the creditor, not the debtor, who would be seeking approval of the settlement. *Vukovich* would appear to direct the court in such circumstances to simply decide whether the agreement reached by the creditor and the debtor was so unconscionable as to make it either unenforceable under the law or contrary to public policy.

30. A settlement stipulation often will include a "drop dead" provision which may require

relief from the court at some later date. For example, a secured creditor may agree to forgo its motion for relief from stay on the condition that the debtor consent to the automatic entry of such an order at a later date if certain agreed to conditions have not been met. There would be no need to enter any order at the time the settlement is reached. Rather, an order should enter only when the secured creditor is actually entitled to the agreed to relief. If the debtor later does not comply with the conditions of the agreement, then the secured party should at that time file a motion with the court which references the agreement and the debtor's alleged breach and which requests the court to honor the agreement by entering an order granting the stipulated relief. If the debtor wishes to oppose the secured creditor's request, then it would be incumbent upon the debtor to seek injunctive relief from the court to restrain the secured creditor's enforcement of their prior agreement.

As for settlements to which the trustee (or the debtor-in-possession) is a party, the Bankruptcy Code may require court intervention in some instances (*e.g.,* a settlement which will materially affect a Chapter 11 plan of reorganization, 11 U.S.C. 1129(b), or which contemplates the transfer of estate property outside the ordinary course, 11 U.S.C. § 363(b)(1)) and the Bankruptcy Rules offer the trustee the option to seek court approval in all other instances. Fed.R.Bankr.P. 9019(a). Whether the trustee actually elects to exercise this option is exclusively the trustee's prerogative. No other party has standing to procure that approval.

■ Another lesson learned is that all settlements for which court approval is sought are subject to independent judicial scrutiny. It is not sufficient that all creditors and parties in interest were notified of the proposed settlement and none objected. Indeed, if the only consequence of a court approved settlement was to estop third parties from later challenging the settlement, then the trustee could accomplish essentially the same result by simply notifying all creditors and other parties in interest of the proposed settlement and hoping that none respond within the time required to object. However, when the trustee requests the court itself to approve the settlement, the trustee is also requesting that the court put its own integrity at stake.

■ The type of illegal provision which would compel a judge not to approve a settlement need not be as extreme as that which the court in *Donovan,* 752 F.2d 1170, gave as an example (*i.e.,* cutting off the violator's ears). In the context of a bankruptcy proceeding, determining whether a settlement is illegal or not would necessarily require consideration of the Bankruptcy Code. For example, a pre-plan settlement between the debtor-in-pos-

session and one of its creditors would be illegal, and therefore not appropriate for court approval, if the settlement would substantially impair creditors' rights under the absolute priority rule in an ensuing plan of reorganization. *Anderson,* 390 U.S. 414, 88 S.Ct. 1157.

■ However, the most important lesson learned from these consent decree cases is that courts should approach the task of approving a settlement proposed by a trustee in the same manner as other courts have approached the task of assessing the propriety of a corporate director's decision.[31] The primary tool used by courts when asked to make such an assessment is the business judgment rule.

■ The business judgment rule is best described as a standard or presumption against which a director's conduct is to be judged. Generally, the rule protects a disinterested director from liability with respect to any business decision on behalf of the corporation which was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984) (*overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000)).

> [D]irectors' decisions will be respected by courts unless the directors are interested or lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available.

*Brehm,* 746 A.2d at 264 n. 66.

There are many rationales for the business judgment rule. It encourages competent individuals to oversee the management of corporations which may have

---

**31.** None of the Sixth Circuit cases actually refers to case law involving corporate decision-making However, as will be seen later in this opinion, the process utilized by the Sixth Circuit to evaluate consent decrees is virtually identical to the process utilized by other courts to evaluate the propriety of decisions made by corporate boards.

hundreds, if not thousands, of interested shareholders. *See, e.g., Briggs v. Spaulding,* 141 U.S. 132, 149, 11 S.Ct. 924, 35 L.Ed. 662 (1891); *Granada Investments, Inc. v. DWG Corp.,* 823 F.Supp. 448, 454–55 (N.D.Ohio 1993). It permits directors to take risks and it provides dynamic leadership without fear of judicial hindsight. *In re Consumers Power Co. Derivative Litigation,* 132 F.R.D. 455, 464 (E.D.Mich.1990); *FDIC v. Castetter,* 184 F.3d 1040, 1044 (9th Cir.1999). It prevents courts from becoming entangled in complex corporate decisions by deferring to the judgment of skilled business persons provided that those persons comply with certain minimum standards.

> [A]fter-the-fact litigation is a most imperfect device to evaluate corporate business decisions. The circumstances surrounding a corporate business decision are not easily reconstructed in a courtroom years later, since business imperatives often call for quick decisions, inevitably based on less than perfect information. The entrepreneur's function is to encounter risks and to confront uncertainty, and a reasoned decision at the time made may seem a wild hunch viewed years later against the background of perfect knowledge.

*Joy v. North,* 692 F.2d 880, 886 (2d Cir. 1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983).

Application of the business judgment rule in the context of the administration of the bankruptcy estate achieves similar objectives. If estates are to be administered outside the purview of the bankruptcy court, then the system should encourage competent individuals to serve as trustees of the bankruptcy estates. The reorganization or liquidation of a distressed debtor requires as much, if not more, creativity and risk-taking as the management of a healthy entity. Bankruptcy courts should be no more willing to second guess competent, disinterested trustees and debtors-in-possession than other courts are willing to second guess competent, disinterested directors.[32]

▇ Bankruptcy trustees, like corporate directors, are fiduciaries. Fiduciaries owe three basic duties to their constituents: the duty of care (*i.e.,* the obligation not to act negligently), the duty of loyalty (*i.e.,* the obligation not to act in the fiduciary's own interests), and the duty of obedience (*i.e.,* the obligation not to act outside of the fiduciary's permitted authority). Whether these three duties have been meet is the essence of any inquiry concerning the propriety of a fiduciary's actions.

▇ If a corporate director's decision is challenged, the initial question is whether the director was disinterested. In other words, did the director have a personal interest in the decision such that her loyalty to the corporation and its shareholders could be called into question?[33] If the

---

**32.** A bankruptcy trustee does have an advantage over the corporate director in that the bankruptcy trustee operates within the context of a court supervised proceeding where some decisions must be pre-approved as a matter of law and other decisions may be pre-approved at the trustee's discretion. One could conclude that the opportunity to secure prior court approval of these decisions eliminates the need for the business judgment rule as a protection for the bankruptcy trustee. However, while the pre-approval process in bankruptcy permits the trustee to proceed with greater assurance in certain areas of bankruptcy estate administration, the recruitment of competent trustees and the need for a judiciary independent of the administration of the bankruptcy estate still justify the adoption of the business judgment rule as the standard for evaluating a trustee's potential liability. Moreover, while consistency may be the hobgoblin of small minds, there nonetheless is merit to holding a bankruptcy trustee to the same standard of conduct regardless of whether the trustee's actions are evaluated before or after the fact. If, as Ford Motor Credit Company v. Weaver, *supra,* instructs, a trustee's liability concerning a decision is to be decided after the fact by whether she exercised good business judgment, then the same standard should apply when the trustee asks a court to exonerate her of any such future liability through the pre-approval process permitted by Rule 9019(a).

**33.** The initial inquiry also examines whether the director has violated her duty of obedi-

director did have a personal interest, then the director may not rely upon the business judgment rule to assess the propriety of her decision. There will be no presumption that she acted reasonably. Rather, it will be incumbent upon her to establish that every aspect of her decision was fair from the perspective of the corporation and its shareholders.

■■■■ Conversely, if the director can establish that she was disinterested with respect to the decision being challenged, then she is entitled to invoke the business judgment rule and the burden shifts to the party challenging the decision to establish that no informed business person would have rationally made the decision being challenged. *See, Brehm v. Eisner*, 746 A.2d 244. Whether the decision was informed or not depends upon what information was reasonably available at the time the decision was made.

> [F]or the business judgment rule to apply, a corporation is not required to undertake the ideal or perfect investigation—one that can anticipate all suggestions and withstand any criticism of derivative plaintiffs or of future court review. What is required is that the corporation makes a *reasonable* effort to reach an informed business decision.... [I]n determining reasonableness, courts are not to second-guess the corporate decision makers' choice of procedures and substitute its standards of reasonableness for standards that reasonable business people would find acceptable.

*In re Consumers Power Co. Derivative Litigation*, 132 F.R.D. at 483 (emphasis in original).

What is remarkable about the procedure to evaluate corporate decision-makers is that it correlates perfectly with the procedure established by the Sixth Circuit in *Vukovich* for the approval of settlements between employment discrimination litigants. To summarize, *Vukovich* requires that the proposed settlement be preliminarily approved by the court to ensure against illegality or collusion, that the settlement then be noticed to persons who might be affected by the settlement, and that those persons then have a right to voice their objections to the proposed settlement subject, however, to the presumption that the settlement is reasonable if the court has given its preliminary approval to the same. *Vukovich*, 720 F.2d at 920–21. The procedure to evaluate corporate decision-making, which includes the business judgment rule, parallels this procedure by requiring a court to make a preliminary determination that the corporate director acted both legally and without self interest before permitting any presumption that the challenged action was reasonable.

■■■■ Combining the process for approving court settlements set forth in *Vukovich* with the analytical framework of the business judgment rule creates a very workable method for evaluating whether trustee/debtor-in-possession settlements should be approved or not. As already noted, the ultimate question raised in a hearing concerning court approval of a trustee's proposed settlement is whether the trustee, in reaching that settlement, has complied with her fiduciary duties to the bankruptcy estate, its creditors, and other parties in interest. Therefore, consistent with *Vukovich*, the court must make a preliminary determination as to whether the proposed settlement includes

---

ence by authorizing an *ultra vires* act. Given the broad grant of authority to most corporations, few corporate decisions are challenged on this basis. However, the Bankruptcy Code imposes significant limitations upon a trustee's authority to act. Consequently, the inquiry concerning whether the duty of care has been fulfilled is more pertinent in the context of a bankruptcy proceeding. For example, a

pre-plan settlement of a significant matter in a Chapter 11 proceeding which was not fair and equitable within the meaning of Section 1129(b)(1) would constitute a breach of the Chapter 11 trustee/debtor-in-possession's duty of obedience regardless of whether the Chapter 11 trustee/debtor-in-possession otherwise acted impartially and reasonably.

provisions which, if enforced, would be illegal or against public policy.[34] Put differently, the court must assess whether the trustee has breached her duty of obedience to the estate.[35]

 *Vukovich* instructs that the court must make this inquiry in order to protect its own integrity. Therefore, the court is to make this determination without regard to whether the trustee or any other party recommends approval. If the proposed settlement includes a provision which is illegal or against public policy, then it is irrelevant whether the settlement is in the best interests of the estate or not.[36]

 If the court concludes that the settlement is not illegal or against public policy, the court must then determine whether the trustee has a personal interest in the subject matter of the settlement. That is, the court must also determine whether the trustee has fulfilled her duty of loyalty to the estate. It is at this juncture that the business judgment rule comes into play. If, after consideration of the record and any third party objections, the court concludes that the trustee is in fact disinterested with respect to the subject matter of the proposed settlement, then the business judgment rule creates the presumption that the trustee also fulfilled her duty of care with respect to reaching that settlement. Conversely, if the court concludes that the trustee's personal interest in the subject matter of the settlement is sufficient to call into question her loyalty to the estate, then it is incumbent upon the trustee to prove that each element of the proposed settlement is reasonable in order to eliminate any question that the trustee was motivated by self-interest in reaching the settlement that she did.

In most Chapter 7 proceedings, it would be unusual for a creditor to challenge the impartiality of the trustee with respect to the settlement which has been proposed. Most Chapter 7 trustees are appointed from a panel which is overseen by the United States trustee. However, such a challenge is not inconceivable. For example, a creditor might under appropriate circumstances establish that the certainty

---

**34.** The court in *Vukovich* also required that there be a preliminary determination as to whether the settlement was the product of collusion. Collusion is better analyzed in the context of the duty of loyalty as opposed to the duty of obedience. However, the effect of collusive behavior by the trustee on the approval of a proposed settlement would be practically the same regardless of whether the collusion is classified as evidencing disobedience or disloyalty. While there is a possibility that collusive behavior could be overlooked if the trustee were able to establish that all other aspects of the proposed settlement were reasonable, it is extremely unlikely that a trustee would ever be able to do so.

**35.** *Vukovich* contemplates that this preliminary step be performed by the court before notice and an opportunity to be heard is given to the parties who might be affected by the court decree. However, there is no reason why this preliminary step may not be done as part of a single hearing where objections by parties in interest could also be heard. The court suspects that *Vukovich* requires this two-step process because notifying the potentially affected parties in a consent decree involving employment discrimination can be both time consuming and costly. Moreover, given the sensitive nature of such decrees, it might be counterproductive to notify parties of a potential settlement which the court would not be willing to approve in any event. These problems are, for the most part, nonexistent in a bankruptcy proceeding. A mailing matrix of creditors and other parties in interest exists from the outset of the proceeding and bankruptcies seldom are as controversial as settlements regarding employment discrimination. In addition, combining the court's preliminary evaluation of the settlement with the consideration of any objections into a single hearing saves time, which often is crucial in a bankruptcy proceeding.

**36.** That the court must make this preliminary determination irrespective of whether third parties support the settlement does not mean that the court should ignore argument from third parties as to why the settlement is illegal or against public policy. Indeed, eliciting comment from interested persons who are not parties to the proposed settlement is a good mechanism to test the court's own assessment of the propriety of the settlement.

of a quick and substantial fee from a settlement unduly influenced the Chapter 7 trustee in her decision to compromise an important claim owned by the estate.

Settlements proposed by a Chapter 11 debtor-in-possession pose far more complex questions concerning the duty of loyalty. A debtor-in-possession is required to "perform all of the functions and duties ... of a trustee serving in a case under this chapter." 11 U.S.C. § 1107. However, the fact remains that the typical Chapter 11 debtor has been managed for the benefit of its shareholders and to the exclusion of all others for years, if not decades, prior to the debtor's bankruptcy petition. While it is certainly possible for corporate management to abandon its past and to assume the role now demanded of it by the Bankruptcy Code, there is no assurance that such a change will occur. Moreover, even if it does, management must still contend with the reality that its reformation may not be so apparent to creditors who oppose a proposed settlement.[37]

 Therefore, it stands to reason that creditors' challenges to proposed settlements on account of "disloyalty" will be more common when the proponent is a debtor-in-possession as opposed to a trustee. Moreover, even if no creditor contests a debtor-in-possession's loyalty in reaching the proposed settlement, the court must still make some independent effort to satisfy itself that the debtor-in-possession's own interest in the proposed settlement has not skewed its duty to act in the best interests of the estate. The investigation

may be as simple as determining from the face of the pleadings that the debtor-in-possession's selfish interests in the outcome of the settlement do not appear to be so great as to call into question the overall reasonableness of the settlement. The point is that the debtor-in-possession's discretionary request for the court to approve the proposed settlement imposes upon the court the obligation to ensure that the court itself will not be later embarrassed by improvidently approving a proposed settlement when it was clear that the settlement unfairly favored the interests of an insolvent debtor's shareholders or third parties over the interests of the debtor's creditors.

 If the court itself is satisfied that the trustee has fulfilled her duties of loyalty and obedience to the estate in reaching the settlement for which approval is sought, both *Vukovich* and the business judgment rule direct that the court is to presume that the trustee has also fulfilled her third duty, that being the duty of care. It therefore becomes the objecting party's burden to establish that the trustee did not make a rational business decision after making a reasonable effort to collect and evaluate information pertinent to that decision. In other words, it is incumbent upon the objecting party to prove that the trustee exercised bad business judgment in reaching the settlement.[38]

 This court's deference to the Sixth Circuit standards for approving consent decrees and to the business judgment

---

**37.** The question of loyalty becomes even more problematic if the corporate debtor-in-possession is controlled by a single shareholder. For example, a settlement of an account receivable between the corporate debtor and its parent corporation would certainly raise questions as to whether the debtor actually had the Chapter 11 estate's interest in mind as it was negotiating with its parent.

**38.** As with its consideration of the other two duties owed by a trustee to the estate, the court must satisfy itself that the trustee has fulfilled her duty of care in reaching the proposed settlement even if no creditor or other

party in interest objects. Again, the reason why the court must make this independent assessment is to protect is own integrity. In making this determination, the court may apply the business judgment rule. That is, if it appears that the trustee has acted in a disinterested fashion in reaching the proposed settlement, the court should presume that the trustee has also fulfilled her duty to exercise due care unless the settlement on its face suggests that the proposed settlement is completely outside what a rational business person would do under similar circumstances.

rule in deciding whether trustee settlements are to be approved or not should not be interpreted as a wholesale rejection of the various factors which courts have over time identified as being pertinent to determining whether a settlement is "fair and equitable" or in the "best interest of creditors."[39] However, these factors do not define the process for approving a trustee's settlement or compromise; they are neither the beginning nor the end. Rather, they are simply factors to be considered within the broader analytical framework provided by *Vukovich* and the business judgment rule. For example, there is no question that consideration of the likelihood of her success at trial and the expense of protracted litigation will have a bearing on evaluating whether the trustee has exercised reasonable care in reaching the settlement for which court approval is sought. However, these factors, as well as any number of other factors which courts have invented or may yet invent, are nothing more than strips of litmus paper to assist the court in determining the ultimate question of whether the trustee has fulfilled her duties of obedience, loyalty and care in accepting the settlement which has been reached.

■ However, one frequently cited factor does warrant further comment. The court in *Drexel v. Loomis* directed courts to consider "the paramount interest of the creditors" and to give "proper deference to their reasonable views in the premises." *Drexel*, 35 F.2d at 806. Some courts have interpreted *Drexel* as requiring a court to give considerable weight to the wishes of creditors if a substantial number of creditors oppose it. "While the desires of the creditors are not binding, a court 'should carefully consider the wishes of the majority of the creditors.'" *Connecticut General Life Insurance Company v. United Companies Financial (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir.1995). I disagree. A bankruptcy estate is no more a democracy than is a corporation. A trustee is charged with administering an estate for the benefit of its creditors and interest holders just as directors are charged with operating the corporation for the benefit of its shareholders. Nothing within the Bankruptcy Code compels a trustee to put to a vote her decision to compromise a claim. Indeed, it is entirely within a trustee's discretion to forgo court approval of a settlement and simply assume the risk that some creditor, or even a majority of creditors, might later hold her accountable for that decision. If creditors were subsequently to challenge the trustee's decision, the number of plaintiffs in the complaint's caption would have no bearing on the outcome of the action. The only question before the court would be

---

**39.** Courts frequently cite the four factors enumerated in *Drexel v. Loomis*, 35 F.2d 800, 806 (8th Cir.1929):

(1) the probability of success in the litigation;
(2) the difficulties of collecting any litigated judgments;
(3) the complexity of the litigation and the expense, inconvenience and delay necessarily attending it; and
(4) the interests of the creditors and interest holders of the estate.

*See, e.g., In re Jackson Brewing Co.*, 624 F.2d 605, 607 (5th Cir.1980); *In re W.T. Grant Co.*, 4 B.R. 53, 69 (Bankr.S.D.N.Y.1980); *In re Meyer*, 105 B.R. 920, 923–27 (Bankr.D.Minn. 1989).

Other courts have cited the expanded list of seven factors set forth in *In re Texaco, Inc.*, 84 B.R. 893, 902 (Bankr.S.D.N.Y.1988):

(1) the probability of success in litigation in comparison to the present and future benefits offered by the settlement.
(2) the prospect of complex and protracted litigation if the settlement is not approved;
(3) the degree to which the settlement is supported by parties in interest;
(4) the competency and experience of counsel who support the settlement;
(5) the relative benefits to be received by members of any affected class;
(6) the nature and breadth of releases to be obtained by officers and directors; and
(7) the extent to which settlement is the product of arms length bargaining.

*In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 758 (Bankr.S.D.N.Y.1992); *In re Dow Corning Corp.*, 192 B.R. at 421–22.

whether the trustee had fulfilled her fiduciary duties to the estate when she made her decision. Therefore, it follows that the number of creditors objecting to a proposed settlement should be equally irrelevant when the trustee requests the court to approve a settlement prior to its consummation.

## CONCLUSION

■ Odysseus was within eyesight of his home when a violent storm returned him to his famous travels about the Mediterranean basin. The outcome of the Section 108(b)/Section 365 motion seemed equally within reach last June. However, just as a wiser and more experienced Odysseus finally was allowed to return to Ithaca and his beloved Penelope, this court can now return to the question whose answer once appeared so deceptively close: should the court interpose its own special knowledge concerning the outcome of the Trustee's motion to extend the time to assume or reject the November 1999 Dalen/Metropolitan Judgment Settlement in evaluating whether to approve the settlement which Trustee had reached with Metropolitan Plant. For the reasons stated in this opinion, this court has concluded that it should not have.

The court is further satisfied that the settlement for which the Trustee sought approval meets the standards established by the Sixth Circuit in *Vukovich* and related cases and the requirements of the business judgment rule. This court is satisfied that there is nothing collusive or illegal about the settlement reached and there is nothing to suggest that Trustee had an interest in the outcome of this matter which would call into question his loyalty to the interests of the estate.

This court is similarly satisfied that Trustee made a rational decision after thoughtful consideration of its merits and drawbacks. This court begins with the presumption that the settlement which the Trustee has proposed is reasonable. No creditor or other party in interest has objected to the settlement. Nor is there anything in the record to suggest that Trustee has not exercised reasonable judgment in making his decision. Trustee himself is an attorney and the attorneys whom he retained to represent him are experienced bankruptcy counsel. Although this court ultimately would have ruled in favor of Trustee on the underlying motion, Trustee had no way of knowing this at the time he reached his settlement with Metropolitan and therefore Trustee had to factor the risk of an unfavorable outcome into his calculations.

Therefore, Metropolitan Plant's motion to alter this court's August 25, 2000 order denying the approval of Trustee's settlement with it is granted.[40] This court will issue a separate order consistent with this opinion.

---

**40.** One consequence of this decision is that the approval of Trustee's settlement with Metropolitan renders moot the court's separate decision that Trustee may extend the time within which to assume or reject the November 1999 Dalen/Metropolitan Judgment Settlement. Metropolitan Plant has appealed the August 25, 2000 order which extended the Trustee's time to assume or reject that settlement. A copy of this opinion will be forwarded to the District Court.