**In re John August ENGMAN, Debtor.**

**No. HG 01–13070.**

United States Bankruptcy Court,
W.D. Michigan.

May 14, 2008.

---

Larry A. Ver Merris, Esq., Grand Rapids, Michigan, for Chapter 7 Trustee.

John August Engman, Pro Se.

Karen Ludwick, Pro Se.

## OPINION RE: DAY & SAWDEY'S SECOND APPLICATION FOR FEES

JEFFREY R. HUGHES, Bankruptcy Judge.

The law firm of Day & Sawdey, PC has applied for interim approval of $ 113,060 in fees and $2,665.05 in expenses with respect to its representation of the bankruptcy estate. The application covers the time period from July 22, 2003 to August 11, 2007. The current trustee[1] does not oppose the request. However, Karen Ludwick, a creditor, and John Engman, the debtor, object to any award.[2]

I am allowing at this time fees and expenses in the reduced amounts of $52,768.50 and $2,456.39, respectively.

### BACKGROUND

Mr. Engman is an attorney. He, along with his former wife, co-developed a residential condominium project known as Sun–Da–Go. The project had 18 unsold building lots when Mr. Engman filed for Chapter 7 relief. It also included common areas and room for the development of seven additional lots.

The project has sparked controversy since its inception. Mr. Engman and his former wife spent years fighting over ownership and control of the development during their divorce. Mr. Engman also had numerous disagreements with the Sun–Da–Go condominium owners' association concerning both the governance of the association and Mr. Engman's responsibilities as the project's developer.

These disputes did not end with the commencement of this case. To the contrary, the Trustee's administration of the development has caused even more controversy. For example, Mr. Engman has objected to every motion by the trustee to liquidate the remaining Sun–Da–Go lots and every attempt by the trustee to resolve the ongoing disputes with his daughters[3] and the condominium association. He also objected to Day & Sawdey's prior fee application.

Larry A. Ver Merris, who is an attorney with Day & Sawdey, characterizes Mr. Engman's current challenge to its fees as just another spurious objection.

> As an attorney practicing in the bankruptcy area for approximately 29 years, the undersigned has handled or otherwise been involved in well over 1,000 bankruptcy cases. Needless to say, this case has been one of the most, if not the most, difficult personal bankruptcy cases the undersigned has been involved in, mostly because of the obstreperous nature of the Debtor . . .

Dkt. No. 404 at ¶ 11.

However, be that as it may, Mr. Engman does have standing to appear and express his displeasure. Trustee has stat-

---

1. Thomas A. Bruinsma was originally appointed as the trustee of this Chapter 7 case and it was Mr. Bruinsma who employed Day & Sawdey on behalf of the estate. Mr. Bruinsma, though, later resigned as trustee and James W. Boyd replaced him. Mr. Boyd in turn employed Barnes & Thornburg as the estate's primary attorneys. However, Mr. Boyd has continued to employ Day & Sawdey as secondary counsel.

2. Ms. Ludwick's objection covers not only fees requested in Day & Sawdey's second application but also fees requested in its first application. However, Day & Sawdey's first application has already been approved on an interim basis. 10/15/04 Order [Dkt. No. 236]. Therefore, I will address Ms. Ludwick's objections only as they relate to Day & Sawdey's second application.

3. The former wife passed away shortly after the commencement of this case. Their daughters are her heirs.

ed on several occasions that all creditors will probably be paid in full and, as such, Mr. Engman may have property returned to him. Day & Sawdey's fees, then, will likely end up being paid out of Mr. Engman's own pocket. Moreover, Mr. Engman's discharge has been denied. Consequently, Mr. Engman is keenly interested in his creditors being paid as much as is possible regardless of what he himself might ultimately receive.[4]

Unfortunately, deciphering Mr. Engman's, and, for that matter, Ms. Ludwick's objections has never been easy. Their immediate submissions are no exception. For example, Mr. Engman's objection shifts from one complaint to another for 13 pages without ever focusing much on the issue at hand. Indeed, for the most part, Mr. Engman only continues the theme he has expressed from the outset of his case: that the trustee and his attorneys are inept.[5]

Nonetheless, I have been able to discern from the broad strokes of both parties'

---

**4.** Day & Sawdey is likely frustrated with Ms. Ludwick as well, for she too has been a frequent objector. Nonetheless, Ms. Ludwick is a creditor and, therefore, also has standing to object.

**5.** Specifically, Mr. Engman contends that the following errors and omissions warrant the denial of Day & Sawdey's second application:

Attorneys herein:
1. Never quieted title to the properties known as Sun-da-go,
2. Never collected any of the accounts receivables[.]
3. Never determined the interests of Linda Leverich in the Joint Venture; . . . .
4. Never pursued Debtor's claims against others as listed on bankruptcy schedules to the financial detriment of the bankruptcy estate[.]
5. Never paid bills when the bills were due[.]
6. Never acted as the Developer; never attended Board meetings of the Sun-da-go Association and never appointed anyone to act on the Estate's behalf[.]
7. Never ran the Business; yet refused to let the Debtor run the business[.]
8. Allowed additional liens to be filed against Sun-da-go, after the date of Bankruptcy filing. Never took action to have liens removed from property.
9. When bills were paid, never got discharges of lien on property; . . . .
10. Allowed creditors to lie to them from the beginning and thereafter refused to accept the truth until this Court had to tell them this was a Joint Venture.
11. Allowed properties to be sold off for pennies on the dollar . . . .
12. Refused to allow sale of the entire development because they could not get approval of the co-owners for a bulk sale; . . . .
13. Never exercised the proper duty of care that would be expected in a case of this nature.
14. When they were overwhelmed with the magnitude of the problem, at no time did they hire or seek the support of other professionals to do the work that they were incapable of doing.
15. Accepted as fact false statements from attorneys in attempts to get their bills paid[.]
16. Failed from the beginning to accept that Sun-da-go, A Thornapple River Community was a joint venture . . . . .
17. Submitted claims for payment before this Court when they knew that the claims were invalid . . .
18. The alleged co-owners seem to be sales people for the Trustee, taking over responsibilities normally born by the Trustee, thereby allowing the Trustee to be compensated for work that was not being done.
19. No tax returns were filed for the Joint Venture; and to this date Attorney VerMerris has provided no accounting for the Joint Venture, nor proof of any financial investment by Mrs. Leverich therein
20. The on-going dues and assessment of the Sun-da-go Association should have been billed annually to the Trustee or Mr. VerMerris
21. Allowed "invested" funds to [sic] for over six years to be deposited at less than 1% of slightly in excess of 1% per annum while allowing interest on legitimate claims to run at 7%–18%, something they would never do with their own assets.

Dkt. No. 389, pp. 9–12.

brushes four specific reasons why they believe Day & Sawdey's requested fees and expenses should be reduced or denied altogether:

1. Day & Sawdey should not be compensated for mismanagement;

2. Day & Sawdey has provided non-legal services for which it should not be compensated;

3. Day & Sawdey has provided non-beneficial services for which it should not be compensated; and

4. Day & Sawdey has submitted unsubstantiated expenses for which it should not be compensated,

I will address these objections in order.

## A. *Mismanagement.*

■ Mr. Engman's and Ms. Ludwick's objections concerning management of the case are premature given that Day & Sawdey at this point is seeking only interim approval of its fees. 11 U.S.C. § 331. Their complaints in time may prove to be well-founded. However, it is inappropriate to automatically shoulder the estate's attorneys with whatever blame is to be placed for the missteps supposedly made. The trustee, after all, is the appointed representative of the bankruptcy estate. 11 U.S.C. § 323(a). It is he who is charged with collecting and reducing to money the properly of the estate and the various other duties imposed by Section 704.[6]

■ Moreover, a trustee's decisions as to how he fulfills these duties is not subject to democratic principles. Granted, there are certain circumstances where the Bankruptcy Code limits a trustee's absolute discretion. (*See, e.g.,* sales outside the ordinary course, 11 U.S.C. § 363(b)). However, for the most part, it is the trustee who alone makes the administrative decisions, including the decisions as to how the attorneys he has retained on behalf of the estate are to be utilized. With that discretion, though, comes the attendant responsibility for the decisions made. The "buck," to paraphrase President Truman, stops at the trustee's desk, not his attorney's.

■ There are, of course, several ways for a dissatisfied creditor or other party in interest to hold the trustee accountable for his decisions or the decisions of others working under his supervision. The trustee's own fees can be challenged as unreasonable. 11 U.S.C. § 326(a). The trustee may also be surcharged if an action taken or a decision made proves to be inconsistent with the fiduciary responsibilities owed by him to the bankruptcy estate and its beneficiaries. *Ford Motor Credit Co. v. Weaver,* 680 F.2d 451, 461–62 (6th Cir. 1982). And finally, a disgruntled party may even seek the removal of a trustee during the course of a bankruptcy estate's administration. 11 U.S.C. § 324(a). Indeed, it is fair to say that the former trustee's resignation in this case was prompted at least in part by Mr. Engman's own motion to replace him as trustee.

On the other hand, it is not appropriate for a dissatisfied creditor to collaterally attack the trustee's decisions by objecting to the fees incurred by the professionals employed by him to carry out his directions. This reality should be self-evident from the general principles of master-servant relationships and the doctrine of

6. 11 U.S.C. § 704. Debtor's petition predates the October 17, 2005 effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub.L. No. 109–8, § 1501(b)(1), 119 Slat. 23.

Unless otherwise indicated, all citations in this opinion to the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* will be to the Code as written prior to the BAPCPA amendments. The citation will be "Section ___."

respondeat superior. It is the master who is accountable for whatever missteps his servant may have committed provided that the same occurred within the scope of the servant's engagement *See*, Restatement Third, Agency §§ 7.03 and 7.07. Moreover, an attorney's ethical responsibility to represent the bankruptcy estate as a client would be severely compromised if creditors could later challenge his fees because the attorney had not taken it upon himself to question the sensibility of whatever the estate's representative, the trustee, had instructed him to do.[7] Again, administering a bankruptcy estate is not a democracy. An attorney should have the right to rely upon the trustee's directions as his authority not only to perform the requested task but also to be compensated for the same.[8]

■ This is not to say, of course, that attorneys and other professionals are free to proceed as they please without retribution so long as they are acting upon the trustee's instructions. Section 330, which governs the final award of compensation to a professional, is quite clear that the court is to consider, among other things, "whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed[.]" 11 U.S.C. § 330(a)(3)(D). Therefore, while an attorney should be able to legitimately rely upon a trustee's direction to, for example, pursue one cause of action but not another without fear of his fees later being denied, it remains the attorney's responsibility to insure that the tasks assigned are reasonably performed.

However, what is before me now is only a request for interim compensation. Consequently, I am deferring Mr. Engman's and Ms. Ludwick's mismanagement objections until the close of the case so that a complete assessment of how the case was administered can be made at that time. I will also defer until then both final consideration of Day & Sawdey's fees under Section 330 and consideration of whatever the former and current trustees may ultimately request as their own fees. Hearing all of the requests at that time will permit the applicants to offer their combined ex-

---

7. A lawyer should act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf. Comment, MICH. RULES OF PROF'L CONDUCT 1.3. Both the lawyer and the client have authority and responsibility in the objectives and means of representation. The client has ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law and the lawyer's professional obligations. Within those limits, a client also has a right to consult with the lawyer about the means to be used in pursuing those objectives. At the same time, a lawyer is not required to pursue objectives or employ means simply because a client may wish that the lawyer do so. A clear distinction between objectives and means sometimes cannot be drawn, and in many cases the client-lawyer relationship partakes of a joint undertaking. **In questions of means, the lawyer should assume responsibility for technical and legal tactical issues, but should defer to the client regarding such questions as the expense to be incurred and concern for third persons who might be adversely affected.** Comment, MICH. RULES OF PROF'L CONDUCT 1.2 (emphasis added).

8. The same is true for other professionals employed by the estate. Assume, for example, that a trustee had retained an expert to appraise hopelessly encumbered property and that a creditor later questioned the necessity of that appraisal. To deny the appraiser his fees under such circumstances would be patently unfair. It should not be for the appraiser to decide whether his services were or were not necessary for the proper administration of the bankruptcy case. That responsibility is the trustee's. If the decision was unwise, then it is the trustee, not the appraiser, who should bear the cost of the fee unnecessarily incurred.

planations as to why the estate was not mismanaged should Mr. Engman or Ms. Ludwick renew their objections. In addition, each applicant will be in a better position to defend in the event one of the other applicants points a finger at him for making an ill-advised decision.

## B. *Nonlegal Services.*

■ This court's local rules provide that an attorney may not charge:

> for nonlegal work, such as copying or delivering documents, preparing or filing proofs of service, or **for trustee duties generally performed without the assistance of an attorney.**

LBR 9013–1(i) (emphasis added).[9]

The logic of this rule is obvious. The trustee employs professionals, including attorneys, in order to benefit from their expertise. Consequently, it follows that the bankruptcy estate should compensate a professional for only those services that required the expertise sought. Indeed, it is for this reason that the order authorizing Day & Sawdey's appointment, which Day & Sawdey itself prepared, limits the scope of its employment to "legal services deemed necessary by the Trustee." 1/17/02 Order [Dkt. No. 11].[10]

Ms. Ludwick legitimately argues that an attorney's substitution of his time for that of the trustee's in connection with nonlegal tasks could lead to "double dipping." In this instance, the estate has recovered approximately $903,000 in assets[11] and, as a consequence, the former and current trustees will be eligible to receive up to $48,400 as their own fees for administering this estate. 11 U.S.C. § 326(a). It would be inappropriate to compensate Day & Sawdey for nonlegal work that the trustee could have performed himself and then pay the trustee the full amount of compensation contemplated under Section 326(a) as well.

Whether such double-dipping would ever actually occur is questionable given that a trustee's compensation is further limited by Section 326(a) to only that which is reasonable. Nonetheless, the question remains as to whether nonlegal services rendered by the estate's attorneys should be reimbursed in this instance at up to $235 per hour, which is the rate Attorney Ver Merris is charging for his legal expertise. If one assumes that $50.00 per hour is a reasonable rate for nonlegal trustee services, the $48,400 currently available for trustee compensation under Section 326(a) would permit 968 hours of available trustee time to administer this case. Indeed, there would still be 484 hours of available time even were the trustee's rate doubled to $100.00 per hour. Consequently, it appears that the trustee in this case should have had ample incentive to perform the

---

9. *See also,* 11 U.S.C. § 328(b) (a trustee who employs himself as the estate's attorney may be compensated as a professional "only to the extent the trustee performed services as attorney . . . for the estate and not for performance of any of the trustee's duties that are generally performed by a trustee without the assistance of an attorney . . . for the estate.").

10. Day & Sawdey has relied upon the phrase "represent or assist" as used in Section 327(a) to suggest that an attorney's services may extend beyond those traditionally associated with the profession. However, Day & Sawdey does not cite any supporting authority. Moreover, it would appear that "assist" was added to "represent" in the disjunctive to address the services that other professionals might render to the estate. For example, while attorneys, and perhaps accountants, would "represent" the estate, appraisers and auctioneers typically would "assist" the estate. In any event, nothing within Section 330 suggests that the assistance contemplated therein is to extend beyond the professional competence of the person employed.

11. *See,* Dkt. No. 404 ¶¶ 3–6 and Dkt. No. 413.

nonlegal services himself at a much more economical rate.

Included as a separate docket entry to this opinion are the 87 pages of time entries filed by Day & Sawdey in support of its application.[12] The underlined entries that are prefaced with a "T" are the entries where it appears that the trustee himself could have performed the described task without relying upon his own legal skills.[13] These suspect entries can generally be divided into five categories: marketing and other nonlegal tasks associated with the unsold Sun–Da–Go lots, providing status reports and exchanging other information concerning the estate, supporting the United States Trustee in objecting to Mr. Engman's discharge, abandoning an interest in property located in Alaska, Michigan, and reviewing proofs of claim.

In many instances, the reason for questioning a particular entry on this basis is clear. Take, for example, several October 7, 2003 entries by Attorney Ver Merris that resulted in a $352.50 charge:

| | |
|---|---|
| Letter to John & Theresa Casto re: their continued interest in buying four lots in Sun–Da–Go. | .3 |
| Examination and review of Castro offer on four lots. | .1 |
| Letter to John Potter re: need for additional information on case vis realty, trees, possible buyers and Debtor's present address. | .6 |
| Letter to Scott Bryant re: ability of only certain limited persons to come in to Sun–Da–Go properties and his interest in purchasing lots. | .5 |

None of these tasks suggest the need for legal expertise. Indeed, it appears that all of these entries fall squarely within what the trustee himself was obligated to undertake as the appointed representative of the bankruptcy estate.[14]

However, there are other instances where the task performed was nonlegal in

12. Although both Mr. Engman and Ms. Ludwick are adamant that Day & Sawdey, and Attorney Ver Merris in particular, has been doing the trustee's own work, neither identified any particular time entries in support of their contention. Rather, they simply contend that the requested fees be denied altogether because of the numerous errors both it and the Trustee have made. The purpose of Sections 330 and 331, though, is not to impose sanctions. Each may be used to eliminate from an application entries that are not justified. However, each section also recognizes that the applicant is entitled to be reasonably compensated for whatever remaining services were legitimately rendered for the benefit of the estate.

13. Both the former and current trustees are licensed attorneys. However, in this instance, each chose not to represent the estate himself but to instead have the estate employ other counsel.

14. Day & Sawdey cites *In re Hunt's Health Care, Inc.*, 161 B.R. 971 (Bankr.N.D.Ind. 1993) as support for its contention that only "quintessential trustee duties" such as "time spent supervising or monitoring the estate's bank accounts, the employment of professionals and the preparation of the trustee's various reports" fall outside of what an attorney might do for the trustee in his stead. *See,* Dkt. No. 413 at p. 3. However, Day & Sawdey reads too much into that case. The issue in *Hunt's Health Care* was whether the trustee, who was also the bankruptcy estate's lawyer, could compensate himself for what appeared to be activities more related to his duties as trustee than to his duties as its attorney. Indeed, Section 328(b) is quite clear that a trustee cannot compensate himself as a professional "for performance of any of the trustee's duties that are generally performed by a trustee without the assistance of an attorney or an accountant for the estate." The *Hunt's Health Care* court, in referencing the activities Day & Sawdey is focusing on, was simply identifying particular activities that fall in the nonlegal category. There is no suggestion that the list given was to be all-inclusive. Nor is there any suggestion that the trustee may employ the estate's attorneys to perform nonlegal tasks for which the trustee himself would be compensated at a presumably much lower rate under Section 326(a).

nature yet there nonetheless appeared to be some justification for Day & Sawdey, as opposed to the trustee, to have expended the effort. For example, there are numerous occasions when a third party would contact Day & Sawdey for information related to the sale of a particular parcel of property or the status of the case. In a perfect world there would be a clear division of responsibilities between the trustee and his attorney regarding communications such that the attorney would field only calls involving legal matters and the trustee would field everything else. However, maintaining that division is virtually impossible because legal and nonlegal matters do overlap. Moreover, to place the attorney in a position where he must always defer nonlegal inquiries to the trustee would be inefficient, if not rude.

On the other hand, it appears in this instance that Attorney Ver Merris' involvement in the case transcended from providing legal services to the estate and some incidental nonlegal services to assuming altogether the trustee's responsibilities with respect to major aspects of the case's administration. The liquidation of the remaining Sun–Da–Go lots stands out most. Day & Sawdey's application suggests that Attorney Ver Merris did not limit his services to only legal matters associated with the disposition of those lots. Rather, it appears that Attorney Ver Merris assumed primary responsibility for all aspects of the liquidation from the outset of the case and that the former trustee limited his involvement to only periodic reviews and updates.

The same observation can be made regarding the collection and dissemination of information. Again, the line between where the trustee's responsibilities end and the attorney's responsibilities begin is gray. It is inevitable that on occasion the attorney will find himself communicating with third parties about matters that are at best tangentially related to legal issues. However, in this instance, the number of apparently nonlegal conversations between Attorney Ver Merris and third parties is substantial. The inference, then, is that it was Attorney Ver Merris, and not the former trustee, who was serving as the spokesman for the estate.

I am, therefore, disallowing $22,193.00 of the requested fees as "nonlegal trustee work." The disallowance of these fees, though, is not final since this is an interim application. Consequently, Day & Sawdey will have the opportunity to resubmit in its final fee application at the close of the case all or a portion of these disallowed entries with whatever additional explanation it might have as to why these suspect activities are in fact compensable as legal services performed on behalf of the estate. Day & Sawdey may also, if it chooses, argue at that time that the trustee specifically directed it to perform the nonlegal services in question and, as such, the court should award it its fees for those services and surcharge the trustee instead.

**C. *Fees That Did Not Benefit The Estate.***

1. *Generally.*

■ Day & Sawdey's application includes numerous entries where the benefit or necessity of the service rendered is questionable. 11 U.S.C. § 330(a)(3)(C). For example, entries like the following appear throughout the application:

10/14/03 LAV [15] Examination and review of Notice of Order Converting Case to CH 7 .1

\* \* \*

15. "LAV" are Attorney Ver Merris' initials.

| 11/4/03 | LAV | Examination and review of Notice of 341 Meeting in re-converted case | .1 |

\* \* \*

| 12/11/03 | LAV | Examination and review of Notice of Status Conference in U.S. Trustee v. Debtor | .1 |

\* \* \*

| 5/17/04 | LAV | Examination and review of U.S. Trustee's Designation of Date, Time and Place to have Eames Chair appraised | .1 |

\* \* \*

| 9/25/06 | LAV | Examination and Review of Notice of Appearance of Sari Jousma | .1 |

Each of these tenths of an hour translates to $23.50 at Attorney Ver Merris' requested rate of $235.00 per hour. Attorney Ver Merris is a very capable attorney who has considerable experience representing bankruptcy estates. Consequently, $23.50 for six minutes of Attorney Ver Merris' time is certainly reasonable when the task at hand is to address a significant legal issue involving the bankruptcy estate. However, the necessity or benefit of the $23.50 expended is not at all evident when the service rendered appears to be nothing more than a cursory review of seemingly inconsequential documents like these.

Other entries are likewise questionable. They include reviewing filings made during the interval when Mr. Engman's case was being administered as a Chapter 13 proceeding, addressing whether Day & Sawdey and the trustee had been defamed by either Mr. Engman or Ms. Ludwick, reviewing the United States Trustee's separate effort to deny Mr. Engman his discharge, and reviewing Mr. Boyd's and Barnes & Thornburg's activities once Mr. Boyd had succeeded Mr. Bruinsma as the trustee and Barnes & Thornburg had been appointed as the bankruptcy estate's new primary counsel.

The total amount of fees that I am disallowing at this time as unnecessary and non-beneficial is $3,249.50. The entries in the separately docketed itemization that correspond to this figure are underlined and prefaced by the letter "U." Again, because only interim compensation is currently being sought, Day & Sawdey may as part of its final application resubmit some or all of these entries for reimbursement with whatever further explanation it might have as to why compensation is appropriate under Section 330.

### 2. *Approval of Fee Applications.*

■ Robert Schellenberg and the law firm of Wrigley & Hoffman objected to Day & Sawdey's first application along with Mr. Engman and Ms. Ludwick. The pending application indicates that Day & Sawdey then expended 33.4 hours addressing those objections over a span of 14 months.

LBR 9013–1 permits attorneys to be reasonably compensated from the estate for preparing and reviewing the application needed to support a fee award. *See also*, 11 U.S.C. § 330(a)(6). However, that is not the issue here. In fact, I am allowing without reduction the $1,739 Day & Sawdey has requested as compensation for the preparation of this application.

What is at issue is whether Day & Sawdey is also entitled to the fees it is requesting for addressing the various objections that were lodged with respect to its prior application. The courts are split. Some permit the recovery of fees associated with the defense of a fee application without qualification. *See, e.g., In re Worldwide Direct, Inc.*, 334 B.R. 108, 111 (D.Del.2005) (collecting cases). These courts, though, have not relied upon the Bankruptcy Code itself as authority for their position. Rath-

er, they have focused on the policy underlying Congress' enactment of Section 330(a), that being that professionals in bankruptcy cases should earn the same income as their non-bankruptcy counterparts. *Id.* They argue that a bankruptcy professional's net award would be unfairly diluted if he was not permitted to recover his fees associated with defending an application. They also argue that a prohibition against recovering such fees would encourage persons to file spurious objections in order to procure unwarranted fee reductions. *Id.*

These are certainly legitimate points. Nonetheless, they are not persuasive. For example, the concern about encouraging frivolous objections if defense fees are not awarded is counterbalanced by the opposite concern that the award of such fees would discourage valid objections out of fear that a prolonged defense will only cause further diminution of the estate through the award of even more fees. Indeed, the possibility of earning fees from defending an objection might encourage the unscrupulous professional to file meritless applications in order to further benefit when the inevitable objections are made. *Cf. Boldt v. Crake (In re Riverside–Linden, Inv. Co.),* 945 F.2d 320, 323 (9th Cir. 1991).

Other courts have countered the risk of overreaching applicants by awarding additional fees only when the objection is overruled. *See, e.g., In re Teraforce Technology Corp.,* 347 B.R. 838, 867 (Bankr. N.D.Tex.2006). Identifying the prevailing party, though, can be tricky in instances when the applicant is seeking reimbursement for a broad array of tasks and the objections are many. Moreover, such an approach raises a much more fundamental concern, for, as *Worldwide Direct* acknowledges, there is no specific authority to award such fees or, for that matter, to

recognize exceptions. It is fair, then, to ask whether the judiciary should be filling this legislative void with its own ideas as to what is good policy. Congress is much better suited to make those decisions.

■ The remaining courts, which I now join, have simply refused to award any additional fees associated with defending an application. *See, e.g., In re Brous,* 370 B.R. 563, 572 (Bankr.S.D.N.Y.2007) (collecting cases). Those courts rely upon the so-called "American Rule." That rule, of course, requires litigants to bear their own legal expenses in the absence of an agreement. *Worldwide Direct* in effect concludes that Congress jettisoned this time-honored maxim so as to ensure that bankruptcy professionals would fare the same as their non-bankruptcy counterparts in being compensated for their time. *Worldwide Direct* is certainly correct that professionals who do not practice bankruptcy law generally are not subjected to the same formalities regarding payment for services rendered. However, *Worldwide Direct* overlooks the fact that a non-bankruptcy professional must still submit his invoice for informal review and challenge by the client before payment and that even judicial intervention may be required if payment is refused. Indeed, considerable hours of time may be spent by a non-bankruptcy attorney explaining and justifying a bill without any hope of reimbursement for the same. Consequently, *Worldwide Direct's* conclusion that bankruptcy professionals are placed at a disadvantage if they are not reimbursed for their costs in defending a fee application does not ring true. If anything, it would appear that *Worldwide Direct's* suspension of the American Rule offers them a benefit that other professionals do not enjoy.

There is also the related question of why bankruptcy professionals should be treated differently than other persons with admin-

istrative claims against the estate. After all, non professional administrative claims are also subject to objection. 11 U.S.C. § 503(b) ("After notice and a hearing, there shall be allowed administrative expenses …"). Perhaps there is a good reason for ignoring the American Rule when professionals are involved but enforcing it with respect to other administrative claimants. Or perhaps there is a reason that the American Rule should be ignored with respect to all administrative claimants. However, if there is, it is better for Congress to articulate it through a statutory enactment than for the courts to speculate what it might be through a succession of opinions.

In summary, then, I am not satisfied that there is sufficient authority under Section 330(a) to warrant the conclusion that the fees incurred by Day & Sawdey in addressing the objections to its first application fall within the ambit of that section. Such fees do not appear on their face to be either necessary or beneficial to the administration of the completion of the case, especially in light of the generally accepted rule that litigants are to bear their own expenses.[16] Therefore, I am disallowing these fees, which total $7,849.00.[17]

### 3. *Approval of Settlement.*

Day & Sawdey's application also includes fees incurred in connection with the former trustee's attempt to have approved an agreement he had reached with the Sun–Da–Go condominium owners' association. The association claimed a substantial lien against all of the project. The agreement contemplated the association being paid $11,226.98 from the proceeds of each lot sold as consideration for the association's release of its lien against that lot.

Day & Sawdey's effort began with the former trustee's request to distribute to the association the agreed upon release amounts in connection with motions he had filed concerning the sale of some lots. Mr. Engman objected because he believed the association was owed nothing. He contended that the association had lacked the legal authority to assess him for the amounts claimed, that its attempts to do so were procedurally defective, and that it had otherwise not established a basis to justify the amounts assessed. He based that contention in part upon the many disputes he had had with the association prior to the commencement of the case.

Several hearings then ensued. Those hearings culminated in my decision on August 13, 2004 that the former trustee had the authority to make the distributions to the association despite Mr. Engman's objection. I made that determination based upon the former trustee's duty under Section 704 "to collect and reduce to money the property of the estate" and the implicit authority therein for the trustee to account to persons claiming liens in the same property. *See also, In re Talbert,* 268 B.R. 811 (Bankr.W.D.Mich.2001).

■ There remained, though, the problem of Mr. Engman's objection, for in effect Mr. Engman was questioning the former trustee's judgment in agreeing to pay such a large sum to the association on account of its claimed lien. As already mentioned, the Sixth Circuit recognizes that a bankruptcy trustee may be held

---

**16.** I do not address here the separate question of whether a professional retained by the bankruptcy estate can override the "American Rule" by including as a condition to his employment the recovery of these additional fees.

**17.** The entries in the attached itemization that comprise this amount are underlined and prefaced by the letters "FA."

accountable for negligence associated with his administration of the case. "A bankruptcy trustee is liable in his official capacity for acts of negligence." *Weaver*, 680 F.2d at 461. *See also, Sherr v. Winkler*, 552 F.2d 1367, 1375 (10th Cir.1977) ("A trustee in bankruptcy may be liable in his official capacity and thus surcharged if he fails to exercise that degree of care required of an ordinarily prudent person serving in such capacity, taking into consideration the discretions allowed.") and *In re Mailman Steam Carpet Cleaning Corp.*, 196 F.3d 1, 7 (1st Cir.1999) ("[T]here is no principled way after *Mosser* to avoid the conclusion that a bankruptcy trustee can be personally liable for negligent breach of fiduciary duty.").

Ordinarily, challenges of this type would be postponed until the conclusion of the bankruptcy case and then heard in the context of either an objection to the trustee's fees or a claim against the trustee for breaching the duty of care he owed to the estate. However, I also determined as part of the hearings concerning Mr. Engman's objection that the agreement the former trustee had reached with the association was in reality the former trustee's attempt to settle Mr. Engman's many disputes with it and that, as such, the former trustee could have that settlement approved over Mr. Engman's objection pursuant to Rule 9019(a).[18] The operative word, though, was "could," for I made it clear in my August 13, 2004 order that the former trustee did not have to secure that approval in order to make the contemplated distributions to the association. Moreover, I made it clear that if the former trustee continued to seek such approval that he would be doing so for his own benefit (*i.e.*, to protect himself from Mr. Engman's anticipated reliance upon the disputed settlement as a basis for later surcharging the former trustee).[19]

18. "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed.R.Bankr.P. 9019(a). All further citations in this opinion to "Rule ____" will be to the Federal Rules of Bankruptcy Procedure.

19. The pertinent language of the August 13, 2004 order was as follows:

I conclude that the dispute between the Chapter 7 Trustee and Debtor arises pursuant to Fed.R.Bankr.P. 9019(a). That rule permits a trustee, at his discretion, to seek from the court approval of a compromise or settlement after motion and a hearing.

\* \* \* \* \* \*

The Chapter 7 Trustee has the inherent authority to resolve in this fashion the disagreement that had existed between Debtor and the condominium association. He does not require a separate order from this court *In re Dalen*, 259 B.R. 586, 593–603 (Bankr.W.D.Mich.2001). However, while the Chapter 7 Trustee may have the inherent authority to resolve this disagreement, his decision to resolve it in the fashion that he has remains subject to challenge by creditors and other parties in interest. *Id.* at 610–615. In this instance, I have concluded that Debtor does have standing to challenge the Chapter 7 Trustee's decision because the bankruptcy estate is potentially solvent.

As discussed in *Dalen*, the Chapter 7 Trustee in this case has fiduciary duties, they being the duties of obedience, loyalty, and care. Debtor's challenge of the Chapter 7 Trustee's decision to resolve the Sun–Da–Go disagreement does not relate to his duty of obedience or loyalty. Rather, it relates to his duty of care. Specifically, Debtor asserts that the Chapter 7 Trustee's decision to resolve the dispute as he has is outside of the universe of decisions a rational business person might select under similar circumstances. In corporate parlance, this test is often referred to as the "business judgment rule."

Whether the Chapter 7 Trustee has fulfilled his fiduciary responsibilities with respect to his decision concerning the condominium association's lien or not would ultimately arise in connection with the propriety of paying the Chapter 7 Trustee his fees in connection with this case or in connection

■ My August 13, 2004 order cited *In re Dalen*, 259 B.R. 586 (Bankr.W.D.Mich. 2001). As I explained in *Dalen*, and as I have now further explained in *In re Novak*, 383 B.R. 660 (Bankr.W.D.Mich.2008), Rule 9019(a) approval of a settlement is not mandatory. Rather, seeking such approval is left to the trustee's discretion. The rule's purpose is to give the trustee the opportunity to secure a comfort order, if you will, from the court before consummating what could be a very controversial decision. The bankruptcy process benefits from trustees settling disputes. Were it not for Rule 9019(a), a trustee might forgo settling a controversy simply out of fear that his judgment would later be questioned in the context of either his own fee application or, worse, a claim against his bond.

■ Rule 9019(a), then, is certainly a useful tool, especially when the motion is unopposed. If, though, there is an objection, one must ask whether the bankruptcy estate should pay for the attorneys' fees incurred in further pursuing the desired relief. In this instance, the additional fees Day & Sawdey incurred in seeking the court's approval of the Sun–Da–Go settlement totaled $32,368.00.[20] It is one thing for the trustee to test the waters by filing a Rule 9019(a) motion and determining whether there is in fact any opposition to the settlement the trustee is proposing. However, it is a different matter if a party objects and the trustee elects to then press on with the motion as a contested hearing. Again, Rule 9019(a) approval is not mandatory. Nothing, therefore, obligates the trustee to proceed further. He always has the option of withdrawing the motion and proceeding without an order. Therefore, if he does choose to continue with the contested Rule 9019(a) motion, it is because of the trustee's own desire to secure for himself the protection afforded by that rule. The bankruptcy estate itself, on the other hand, gains nothing from the trustee's further pursuit of the desired relief.

I will allow, then, Day & Sawdey's fees regarding the Rule 9019(a) motion through August 13, 2004, that being the date when the motion clearly became a contested matter. I do so because the opportunity to object provided by this process did reveal Mr. Engman's objection and, as such, permitted the former trustee to make an even more informed decision regarding the settlement he had tentatively reached. Granted, the former trustee would have also personally benefited from the exercise had the Rule 9019(a) motion been unopposed. Nonetheless, I am satisfied that the attendant benefit to the estate of this preliminary effort, coupled with the relatively nominal cost of pursuing the Rule 9019(a) motion up to that point, justifies reimbursing the attorneys' fees incurred in connection with the same.

---

with whether he should be surcharged for his breach of those duties. However, Fed. R.Bankr.P. 9019(a) gives the Chapter 7 Trustee the opportunity for him to secure a declaration that he has not violated his duties at or before the time the settlement is reached. *Id.* at 603–4.
Therefore, I conclude that the dispute between the Chapter 7 Trustee and Debtor is in effect a request by the Chapter 7 Trustee pursuant to Fed.R.Bankr.P. 9019(a) to declare that he has complied with his duty of care to the estate in reaching the resolution he has with the condominium association concerning its lien. Moreover, I further conclude that Debtor's objection is in fact a challenge to the Chapter 7 Trustee's contention that he exercised his duty of care in making the decision to resolve the disagreement with the condominium association in the manner that he has.
Dkt. No. 226 at pp. 2–3.

**20.** The entries in the attached itemization that correspond to this figure are underlined and prefaced by the letters "SA."

However, I will not allow Day & Sawdey's fees relating to the Rule 9019(a) that were incurred after August 13, 2004 because I cannot discern any further benefit to the estate from those services. Nor were those services necessary to the case's administration. The August 13, 2004 order already had provided the former trustee with whatever additional assurance he needed regarding his authority to proceed with the settlement he had reached with the association. Consequently, he could have simply withdrawn his motion and avoided altogether a confrontation at that time as to whether he had made a sound decision or not. Indeed, withdrawal of the motion might have prompted further negotiations with the association and perhaps an even better settlement for the estate.[21]

Denying the reimbursement of these fees does not mean that the former trustee was wrong in attempting to secure for himself a preemptive ruling on what may have appeared to him an inevitable challenge by Mr. Engman regarding his decision to settle. Rule 9019(a) clearly provides him with that opportunity. However, Rule 9019(a) does not also permit him to recover from the bankruptcy estate the fees incurred by him in further seeking the desired order once it has become clear that his motion will be contested.

Therefore, the $32,368.00 in fees requested by Day & Sawdey for pursuing the Rule 9019(a) motion after August 13, 2004 are not approved.[22]

### D. *Unsubstantiated Expenses.*

 Mr. Engman also contends that Day & Sawdey's request for mileage and parking is improper. He bases his contention upon LBR 9013–1(n)'s requirement

---

21. I ultimately did not grant the former trustee's Rule 9019(a) motion. *See, In re Engman,* 331 B.R. 277 (Bankr.W.D.Mich.2005). However, the court's disapproval of the settlement he proposed has no bearing on whether Day & Sawdey's related fees should be allowed. The benefit to the estate would have been no greater had the former trustee prevailed.

22. Day & Sawdey's post-August 13, 2004 effort to approve the Sun–Da–Go settlement involved another 177.5 hours of attorney and paralegal time and culminated in a three and one-half day evidentiary hearing. Consequently, "unreasonableness" might appear to be another reason for disallowing the requested fees. After all:

> [a] bankruptcy judge need not conduct a mini-trial or write an extensive opinion every time he approves or disapproves a settlement. The judge need only be apprised of the relevant facts and law so that he can make an informed and intelligent decision and set out the reasons for that decision.

*In re Anderson,* 377 B.R. 865, 871 (6th Cir. BAP 2007) (quoting *Fishell v. Soltow (In re Fishell),* 47 F.3d 1168).

However, in this instance, Mr. Engman had given many legitimate reasons why the former trustee's decision to settle with the Sun–Da–Go association should not be approved. It certainly would have been nice if both parties could have packaged their respective positions into half-hour Power Point presentations. However, Mr. Engman and the former trustee were each entitled to offer whatever facts and law he believed was relevant to the "informed and intelligent" decision I was required to make. Perhaps "mini-trials" and "extensive opinions" are not always required. However, Mr. Engman, in opposing the relief the former trustee was requesting, was clearly entitled to due process, especially given that the former trustee's only apparent purpose in proceeding further with the contested Rule 9019(a) was to prevent Mr. Engman from later using the settlement to support a claim of negligence against him. The former trustee was likewise entitled to respond tit-for-tat to Mr. Engman's many accusations.

Therefore, I do not find the time expended by Day & Sawdey on the former trustee's behalf to be unreasonable. Nonetheless, the fact remains that the bankruptcy estate should not have to bear the cost of what in reality was a personal endeavor for the former trustee's own benefit.

that the applicant "list each expense, its date incurred/paid, and a description of the nature and purpose of the expense."

Day & Sawdey's second fee application includes 31 unexplained entries for mileage and 14 unexplained entries for parking. Granted, in some instances justification can be inferred from Day & Sawdey's detail of the services rendered. However, in other instances, it cannot. For example, the requests for $6.08 in mileage on May 2, 2005 and $.97 in mileage on December 8, 2005 do not correspond to discernible travel activities by a Day & Sawdey attorney or employee on either of those days.

Therefore, I am disallowing at this time all requested reimbursement for mileage and parking. These requests total $153.81 and $55.85, respectively. The corresponding entries in the attached itemization are underlined. However, Day & Sawdey may include in its final application for fees another request for reimbursement of the disallowed mileage and parking provided that acceptable explanations are also offered at that time.

### E. *Adjustment.*

The disallowed fees total $70,292.50. However, Day & Sawdey already has voluntarily reduced its fees by $5,368.00 to reflect a "blended" billing rate of no more than $200.00 per hour. *See,* Day & Sawdey's Second Fee Application. It appeals that Day & Sawdey made this adjustment because Attorney Ver Merris' billing rate is $235.00. Although that rate would seem excessive if Attorney Ver Merris were rendering ordinary services to the estate in connection with a routine Chapter 7 case, the Engman bankruptcy case is not a typical Chapter 7 case. It involves complicat-

ed legal and factual issues that justified the estate retaining an attorney at the higher rate charged by Attorney Ver Merris. Consequently, I am not requiring the $5,368.00 adjustment. Moreover, I am applying that adjustment to reduce the amount of the fees being disallowed at this time.

### *CONCLUSION*

For the reasons stated, the fees and expenses requested in Day & Sawdey's second application filed on August 16, 2007 are allowed on an interim basis in the respective amounts of $52,768.50 [23] and $2,456.39.[24]

The court will enter a separate order consistent with this opinion.

---

23. Total fees requested ($113,060) minus fees disallowed ($65,659.50) plus returned credit for voluntary rate adjustment ($5,368).

24. Total expenses requested ($2,666.05) minus expenses disallowed ($209.66).